BRIDGEPORT WINDOW HARDWARE COMPANY *vs.* HEMAN OSBORNE.

Hampden.    September 28, 1915. — February 8, 1916.

Present: RUGG, C. J., LORING, CROSBY, & PIERCE, JJ.

*Corporation,* Subscription to shares of stock. *Equity Jurisdiction,* To enforce specific performance. *Contract,* Performance and breach.

Where a corporation issues a certificate for shares of its capital stock which is accepted by one who has consented to become a stockholder, has participated in its organization and has agreed to pay for his shares by a transfer of certain

letters patent, no formal contract of subscription for the shares is necessary to enforce payment for them.

Where one, who participated in the organization of a corporation and became one of its directors, agreed ,to take nine hundred shares of its capital stock and to pay therefor by the transfer to the corporation of certain patent rights, and a certificate for the shares was issued to and accepted by him, he is not absolved from paying for such shares by an agreement, made between him and the corporation after its incorporation and after he had received his shares, to the effect that he should be paid by notes of the corporation a certain sum of money for the patent rights, an assignment of which should be deposited as an escrow with a certain bank, and that upon a default in the payment of any of the notes, the assignment should be redelivered to him; nor is his liability to pay for the shares affected by an agreement made among the individual subscribers for shares to the effect that the defendant should retain only three hundred and thirty-three of the shares.

. BILL IN EQUITY, filed in the Superior Court on June 8, 1914, alleging that at the first meeting of the plaintiff corporation the defendant subscribed for nine hundred shares of the plaintiff's capital stock for which he agreed to transfer to the plaintiff certain letters patent and that he had not so transferred the letters patent. The prayer of the bill was that the defendant be ordered either to carry out his agreement to transfer the letters patent or to pay in cash for the nine hundred shares.

The suit was referred to a master. The material facts found by him are stated in the opinion. By order of *Carroll*, J., a decree was entered dismissing the bill. The plaintiff appealed.

The case was submitted on briefs.

*C. C. Spellman & C. F. Spellman*, for the plaintiff.

*J. Aldrich*, for the defendant.

CROSBY, J. The plaintiff is a corporation organized under the general laws of the State of Connecticut. The capital stock of the corporation was fixed at $100,000, all of which was designated as common stock, divided into one thousand shares of the par value of $100 each. The original incorporators were Frederick Carpenter, William C. Russell and J. H. Crossley. The master finds that by amendments made before incorporation, Arthur B. Lieberum and Arthur M. Comley were substituted for Frederick Carpenter and William C. Russell as incorporators. A notice dated April 6, 1911, was issued for a meeting to be held on April 10, 1911. This notice stated that "The undersigned being all of the subscribers to the stock of the Bridgeport Window Hardware Company, a corporation to be organized under the laws of

the State of Connecticut, hereby unite in calling the first meeting of said corporation." This notice was signed by the defendant and Crossley and Lieberum. At the first meeting of the stockholders, Lieberum was elected temporary clerk, Crossley, Lieberum and the defendant were elected directors of the corporation, and by-laws were adopted. The minutes of this meeting include the recital that "The following named persons, subscribers for the stock of said corporation, were by ballot duly elected directors of said corporation." The record of this meeting was signed by the defendant and Crossley and Lieberum.

A call for the first meeting of the directors, to be held on April 10, 1911, was also issued on April 6, 1911, and was signed by Crossley, Lieberum and the defendant. At this meeting, held on April 10, 1911, a president, secretary and treasurer were elected, and the following votes were passed:

"Voted, That a majority of the directors make and cause to be filed a Certificate of Organization of this Corporation, in compliance with the requirements of law.

"Voted, That the secretary of this corporation be and he is hereby directed to file said Certificate of Organization in the office of the Secretary of State.

"Voted, That a majority of the directors be ordered and directed to place upon the record book of this corporation, a certificate that the value of the property paid in on account of subscriptions to capital stock is worth at least the sum of Ninety Thousand Dollars, the amount for which it has so been paid in."

The following certificate also was made and signed by Crossley and Lieberum:

"We, the undersigned, a majority of the directors of the Bridgeport Window Hardware Company, do hereby certify that there has been paid in as full payment for the stock subscriptions of Heman Osborne patent rights and letters patents numbers, 858,288; 904,145; 953,703, and that in our opinion, the said patents and patent rights so paid in are of the value of Ninety Thousand Dollars, the amount for which said letters patent and patent rights have been received. This statement and certification is to be made a part of the record of said corporation."

On April 10, 1911, a certificate of organization was signed and

sworn to by Crossley and Lieberum, being a majority of the directors. This certificate described the capital stock of the corporation as one thousand shares of $100 each.

"That the amount paid thereon in cash is ten thousand dollars.

"That the amount paid thereon in property other than cash is ninety thousand dollars.

"That one hundred dollars has been paid upon each share subscribed for."

The names of the original subscribers to the stock are stated in the certificate of organization to be the defendant, Lieberum, and Crossley, the former having subscribed to nine hundred shares, and the two others to fifty shares each, all of said stock being the common stock of the corporation. The defendant is described in the certificate as one of the directors of the corporation. This certificate was approved by the Secretary of State of Connecticut on April 22, 1911.

From the findings of the master, it is plain that the corporate existence began on June 27, 1910, when the certificate of incorporation was approved by the Secretary of State.

While the certificate of organization was not signed by the defendant, and the record does not show that any formal subscription for shares of stock ever was executed by him, still we are of opinion that there was ample evidence, as shown by the acts of the defendant, including the finding of the master that he has sold for a valuable consideration some of the stock so held by him, to warrant a finding that he did actually become a subscriber to nine hundred shares as set forth in the certificate of organization. In view of all the circumstances as disclosed by the evidence, it would be difficult, if not impossible, to come to any other conclusion. No formal contract of subscription is necessary where the corporation issues for the shares, a certificate which is accepted by one who has consented to become a stockholder. *Hartford & New Haven Railroad* v. *Kennedy*, 12 Conn. 499. It has been held that if a person orally promises pending the organization of a corporation, to take a stated number of shares and he afterwards accepts certificates for the stock, he will be bound to pay the amount of the subscription and is estopped to deny that he is a stockholder. *Fanning* v. *Hibernia Ins. Co.*

37 Ohio St. 339. *Davis* v. *Essex Baptist Society,* 44 Conn. 582. *Johnson* v. *Allis,* 71 Conn. 207. *Jackson Fire & Marine Ins. Co. Ltd.* v. *Walle,* 105 La. 89. In *Sherwood* v. *Illinois Trust & Savings Bank,* 195 Ill. 112, it was held that the name of a person appearing on the books of a corporation as a stockholder is *prima facie* evidence that he is the owner of the stock. See Cook on Corporations, (7th ed.) § 55, note. The acts of the defendant, who was a director in the corporation and participated in its organization, and his acceptance of a certificate of the stock fully justified the finding of the master that "the defendant did subscribe for nine hundred shares of the capital stock of the plaintiff corporation which shares were originally to be issued for patent rights then owned by the defendant." While the date of the defendant's subscription does not appear from the master's report, it is certain that it was on or before April 10, 1911.

The master finds that the nine hundred shares were issued to the defendant, and it is conceded by him that he never has paid either in property or in cash anything whatever therefor. The plaintiff by this bill seeks to compel the defendant to assign to it the letters patent described in the bill or to pay in cash the sum of $90,000 for the stock so received by him.

The record shows that when proceedings were started to organize the corporation, the defendant Osborne was the owner of the letters patent described in the bill, and that one of the purposes of the proposed incorporation of the plaintiff company, if not its sole purpose, was to acquire these patents, and manufacture, sell and otherwise deal in the articles made or to be made under the patents. The certificate of incorporation recites that among the purposes to be promoted or carried out by the corporation are the following: "In particular to acquire certain patents issued to Heman Osborne dated June 11, 1907, November 17, 1908, and April 5, 1910, respectively and numbered 856,288, 904,145, and 953,703, respectively; and to manufacture, purchase, sell or otherwise deal in the articles manufactured or to be manufactured under the said patents; to purchase or otherwise acquire patents, patent rights and privileges, improvements or secret processes for or in any way relating to all or any of the objects aforesaid, and to grant licenses for the use of, or to sell or otherwise deal with any patents, patent rights and

privileges, improvements or secret processes acquired by the company."

The master finds that the defendant never has transferred to the corporation these letters patent for which the stock was to be issued to him, but instead entered into a written agreement with the plaintiff, at a meeting held on April 15, 1911. This agreement is dated April 17, 1911, and refers to what is termed an "escrow agreement" which is of even date with and is made a part of the original agreement. The "escrow agreement" was also ratified by the directors.

By the terms of these agreements the plaintiff promised to pay the defendant $15,000 for assignments of the patents described therein, being the same patents referred to in the certificate of incorporation, for which the master finds that the nine hundred shares originally were to be issued to the defendant. Of this $15,000, $5,000 was recited in the agreement as paid, and the balance, $10,000, was evidenced by eight notes of $1,250 each, payable at various dates, the last falling due April 1, 1913. All of the notes except the last three maturing October 1, 1912, January 1, 1913, and April 1, 1913, respectively, have been paid.

The "escrow agreement" provides, among other things, that an assignment of the patents and the notes shall be deposited with the Springfield National Bank to be held by it as an escrow, and upon default of payment of any one of the notes for a period of twenty days, the bank agrees, upon demand made by Osborne, to return to him the assignment, and the remaining unpaid notes are to be returned to the plaintiff. The agreement also provides that, during the time the assignment remains an escrow the plaintiff is authorized to make, use and sell articles covered by the patents. It is also stipulated that "all moneys which may have been paid in taking up of any of the notes less than all thereof, shall be considered as in payment of consideration for license under patents which it (the plaintiff) shall have enjoyed up to the time or times of such payment or payments."

In December following the failure of the plaintiff to pay the note due October 1, 1912, the defendant withdrew from the bank the assignment to the plaintiff covering the patents which had been deposited as an escrow with the bank pursuant to the agree-

ments above referred to.  The defendant contends that as there has been a breach of these agreements he is absolved from delivering to the plaintiff the assignment of the patents or paying the amount of his subscription for the nine hundred shares of stock issued to him.  It is to be borne in mind that when these agreements were entered into on April 17, 1911, the defendant had absolutely and unconditionally subscribed for nine hundred shares of the stock of the corporation at par, and had agreed to pay for the same by the assignment of his letters patent to the plaintiff. At that time the corporation was fully organized, and had been authorized to make contracts since June 27, 1910.  These agreements relate solely to the assignment of the patents and constitute in effect a new agreement concerning the terms upon which the patents should be assigned to the plaintiff, and provide that, instead of the assignment being made to the plaintiff in payment of the defendant's subscription for nine hundred shares, the plaintiff should pay the defendant $15,000 for such assignments. The agreements do not refer to the defendant's subscription to the stock and have nothing whatever to do with that subject.

There is nothing in the record to show that the plaintiff ever has made any agreement to release the defendant from the payment of his subscription.  It follows that he remains liable therefor.  The finding of the master that "There was an agreement among the subscribers that the defendant was to retain three hundred and thirty-three of said shares" was not an agreement with the plaintiff corporation, nor was it a finding that the defendant is released from his subscription obligations.  It was merely an agreement between the subscribers to which the plaintiff corporation was not a party, and it is not bound thereby. The agreement of the defendant to pay his subscription remained intact and the plaintiff has a right to enforce it.  Of course the agreement under which the plaintiff was to pay the defendant $15,000 for an assignment of the patents released him from the prior obligation that his subscription should be paid for by such assignment, but it does not follow that he is released from the payment of his subscription for nine hundred shares.  The plaintiff having issued to the defendant nine hundred shares for which he subscribed, is entitled to recover the amount due therefor.

Any secret or other agreement entered into between the defendant and the other subscribers, to which the corporation was not a party, that he should not be called upon to pay his subscription, is not binding upon the corporation. *Meyer* v. *Blair*, 109 N. Y. 600. *Jackson Fire & Marine Ins. Co. Ltd.* v. *Walle*, 105 La. 89. *White Mountains Railroad* v. *Eastman*, 34 N. H. 124. *Mann* v. *Cooke*, 20 Conn. 178. *Ridgefield & New York Railroad* v. *Brush*, 43 Conn. 86. See also *Anglo-American Land, Mortgage & Agency Co.* v. *Dyer*, 181 Mass. 593, 598.

As the defendant is liable upon his subscription, the decree dismissing the bill is reversed, and a new decree with costs is to be entered ordering the defendant to pay the full amount of his subscription in cash or at his option to assign to the plaintiff the patents described in the bill.

*So ordered.*