WHALER MOTOR INN, INC. *vs.* RICHARD H. PARSONS
& others
(and a companion case[1]).

Bristol.    May 14, 1975. — December 29, 1975.

Present: HALE, C.J., ROSE, KEVILLE, GOODMAN, GRANT, &
ARMSTRONG, JJ.

*Equity Pleading and Practice,* Master: recommittal, summary of evi-
dence, findings; Appeal.  *Corporation,* Liability of promoter, Officers
and agents.  *Fiduciary.  Contract,* Subscription for corporate shares.
*Damages,* For breach of fiduciary duty.

In a suit by a corporation to recover from a promoter secret profits
realized by him in his sale of real estate to the corporation, the
proper measure of damages in the circumstances was the difference
between the price paid by the corporation and the fair market value
of the property at the time of the sale especially as the property had
been acquired by the promoter before the corporation was formed
and before the site was chosen by the corporation. [670-672] KEVILLE,
J., dissenting.
The fact that the promoters of a corporation issued stock to themselves
without a cash payment as required by a subscription agreement
and failed thereafter either to inform the outside investors that the
stock was issued for services and expenses or to obtain ratification
of the issuance at a later date upon complete revelation of the facts
to the stockholders or an independent board of directors rendered
the promoters liable for breach of the subscription contract or, al-
ternatively, for secret profits realized by the transaction; the mea-
sure of damages for which the promoters were accountable to the
corporation was the difference between the value of each block of
shares at the time of issuance and the fair value of the services
rendered and expenses incurred by each promoter which benefitted
the corporation. [672-675] KEVILLE, J., dissenting.

---

[1] Whaler Motor Inn, Inc. *vs.* David Freedman and Louis Freedman.
On September 15, 1975, an opinion in this case was released by the
Appeals Court which, in part, dismissed the Freedmans' appeal in the
second case. At that time the Superior Court docket showed that they
had failed to claim a timely appeal. Subsequently, the Freedmans filed
a petition for rehearing, supported by affidavits, alleging that they had
filed a timely appeal and that the Superior Court docket was in error.
We remanded the case to the Superior Court which determined that
such an error had in fact been made. Accordingly, the court now di-
rects that the original opinion be replaced by the present opinion and
that a new rescript issue.

Where a master correctly found the promoters of a corporation liable for secret profits realized by them in the issuance of stock to themselves in exchange for services and expenses but failed to make a determination of the value of the promoters' services and expenses, the case was remanded for an evidentiary hearing to determine the amount of credit to which each promoter would be entitled. [675-676]

Two BILLS IN EQUITY filed in the Superior Court on May 28, 1970, and September 14, 1970, respectively.

The suits were heard by *Zarrow*, J., on a master's report.

*John M. Doukas* for Richard H. Parsons.

*Thomas F. McGuire* for David S. Barnet & others, trustees.

*John A. Tierney* for David Freedman & another.

*Howard M. Miller* for Whaler Motor Inn, Inc.

HALE, C.J.    These two cases were tried together before a master and are here on the defendants' appeals from interlocutory and final decrees entered in the Superior Court in each case. Both cases arise out of complaints by Whaler Motor Inn, Inc. (corporation) against its promoters and certain of its stockholders other than the promoters.[2]

In the first case the corporation sought the return for cancellation of capital stock which it issued to the defendants Richard Parsons (Parsons), Nathaniel Lipton (Lipton), and Lipton's wife, allegedly without payment. The trustees for the benefit of the creditors of the Liptons were also made defendants since the Liptons' stock in the corporation had been transferred to those trustees. The corporation also sought an accounting against Lipton and Parsons, recovery of "secret profits" of Parsons arising from his sale of real estate to the corporation, the recovery of cash paid, and the cancellation of a promissory note of the corporation given to Parsons in connection with the repurchase by the corporation of certain shares of stock originally issued to him.

In the second case the corporation sought the return for

---

[2] The cases against other stockholders were dismissed and are not before us.

cancellation of capital stock issued to the defendants David and Louis Freedman, allegedly without payment.

Following an extensive hearing the master submitted his report, to which the defendants filed timely objections together with a request for summaries of certain evidence pursuant to Rule 90 of the Superior Court (1954) (as in effect prior to July 1, 1974).[3] The material portions of the transcript were supplied to the master by the defendants in support of their objections. The master failed to provide any summary, and upon motion of the parties the report was recommitted with an order that a summary be made. The master then filed the summary. The plaintiff moved for confirmation of the report, and the defendants moved for its recommittal, claiming that the summary was not fair and accurate. The court entered an interlocutory decree which confirmed the report and impliedly denied the defendants' motions to recommit. The defendants appealed from the interlocutory decree confirming the report. As no affidavits setting forth what would be a fair summary of the evidence were submitted in support of the motions to recommit, no error appears from the implied denials thereof. *Minot* v. *Minot,* 319 Mass. 253, 260 (1946). *Cantor* v. *Cantor,* 325 Mass. 719, 721 (1950). See *Cross Co.* v. *Clermont's Inc.* 361 Mass. 874 (1972).

The final decree in the first case contained the following provisions: (1) Parsons and the trustees were ordered to deliver to the corporation the stock held by them; in the alternative the corporation was authorized to cancel the stock if it was not so delivered; (2) Parsons was ordered to return the corporation's promissory note in the amount of $71,000, which it had issued in connection with the repurchase of Parsons' stock; and (3) Lipton and Parsons were jointly and severally ordered to pay to the plaintiff $82,525.96, of which $29,000 (less a credit of $68.55) represented payment to Parsons for the repurchase of part of his stock by the corporation; $37,500 represented the amount of the profit received by Parsons from the sale of

---

[3] See Superior Court Rule 49 (effective July 1, 1974).

real estate to the corporation; and $16,094.51 represented interest on the latter amount.[4]

The final decree in the second case ordered the Freedmans to deliver their stock in the corporation to the plaintiff and provided for the cancellation of such stock in the event of nondelivery.

The defendants in each case appealed from final decrees.

The bulky and unindexed appendix filed in this court includes most of the exhibits which were before the master and which have been certified to us in their original form, purportedly pursuant to Rule 1:06 of the Appeals Court (as in effect until July 1, 1974), 1 Mass. App. Ct. 886 (1972). In addition, about 100 pages of the transcript of testimony before the master have been "designated" and reproduced, apparently pursuant to Rule 1:02 of the Appeals Court (as in effect until July 1, 1974), 1 Mass. App. Ct. 883 (1972). Neither of these inclusions is appropriate or proper in a case where, as here, the evidence has not been ordered reported and the exhibits are not incorporated in the master's report (see *Royal Tool & Gauge Corp.* v. *Clerk of Courts for the County of Hampden,* 326 Mass. 390, 391 [1950]; *Papale* v. *Westboro Country Club Inc.* 2 Mass. App. Ct. 313, 315-316 [1974], S. C. 368 Mass. 808 [1975]; contrast *Shelburne Shirt Co. Inc.* v. *Singer,* 322 Mass. 262, 265 [1948]), and we do not consider them. *Joyner* v. *Lenox Sav. Bank,* 322 Mass. 46, 57-58 (1947). *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975).

As all but one[5] of the defendants' objections, which are now exceptions, were directed to the insufficiency of the

---

[4] The decree further directed that the sum of $19,733.82, found to have been owed by the corporation to Lipton, could be offset against the amount owed by Lipton to the corporation.

[5] That exception, briefed and argued only by Parsons, was addressed to the materiality of the admission in evidence of Parsons' personal income tax returns. These were apparently admitted as relevant to the question of the value of certain real estate sold by Parsons to the corporation. On the facts found by the master and in view of the result we reach on the issue of Parsons' liability for the profit realized on the sale of that real estate, we need not determine whether there was error in the admission of that evidence.

evidence to support the findings of fact made by the master, and as the summary of the evidence does not demonstrate error in the master's findings, the exceptions cannot prevail. See *P & D Serv. Co. Inc.* v. *Zoning Bd. of Appeals of Dedham,* 359 Mass. 96, 98 (1971), and cases cited therein.

There remains for our determination the question whether the facts found by the master justified the relief granted by the final decrees. *New England Overall Co. Inc.* v. *Woltmann,* 343 Mass. 69, 75 (1961). *Sarnow* v. *Sarnow,* 359 Mass. 764 (1971). *Medeiros* v. *Medeiros,* 2 Mass. App. Ct. 84, 88 (1974). We summarize the facts found by the master, reserving certain of the findings for inclusion later in this opinion.[6]

Sometime in late 1965 or early 1966, at Lipton's behest, Lipton, Parsons and the Freedmans met for the purpose of exploring the possibility of constructing a motel or motor inn in the New Bedford area. All four men had considerable experience in business. They met frequently to discuss the economic feasibility of the project, to exchange opinions and to develop plans. They visited existing motels and motor inns to gain insight into the development and operation of a motel or motor inn. Having accomplished the preliminary work, they decided early in 1966 to go forward with their plans to construct and operate a motel or motor inn.

Having determined that site location was of paramount importance, they considered several sites in New Bedford and surrounding towns. They contracted for a feasibility study, which was completed on November 30, 1966. They selected a site owned by Parsons on Hathaway Road in New Bedford, close to Route 140 and Interstate Highway I-95. This site was superior to the other sites which they had considered because of its location in the center of in-

---

[6] The master in his report set forth only subsidiary findings. We are free to draw our own inferences from those findings. *O'Brien* v. *Dwight,* 363 Mass. 256, 281 (1973). *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975). *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 (1975).

dustrial, business and recreation areas to which a motel would cater, its elevation, and its visibility and accessibility from major highways and roads. Thereafter the defendants traveled to Memphis, New York City, Connecticut and other places to investigate and determine the choice of a franchise best suited to the contemplated operation. The promoters eventually "agreed to operate under a Holiday Inn franchise." Considerable amounts of time and money were spent by the defendants for site preparation, engineering services, legal fees and services, franchise fees, architectural fees, leasing of land, options, managers' services, and travel. Parsons and Lipton made expenditures for the benefit of the corporation in the amounts of $18,453.55 and $31,433.82, respectively. In so doing the defendants were motivated by the intent and purpose of building a financially strong enterprise to insure themselves a sound investment and a reasonable profit. They did not enter into any formal agreement as to how they would be compensated.

In 1964, Parsons had acquired a small parcel of land for approximately $2,000 which eventually became part of the motel site. On July 20, 1966, he acquired an adjacent parcel for $35,000. That land had been acquired by him prior to the time of its selection as the motel site. Parsons had himself intended to build a motel on the site. The site was traversed by Rowe Street, a public way. In order to accommodate a motel at the site, Parsons had obtained from the city of New Bedford a discontinuance of Rowe Street, together with extensions of water mains and sewer lines to the property. Parsons had in turn granted the city an easement from Hathaway Road for the installation of the utility services which he had arranged. He had also acquired an option for the purchase of another parcel of land.

The promoters — Parsons, Lipton, and the Freedmans — caused the corporation to be formed and incorporated on February 14, 1967, with 1,000 shares of no-par stock authorized to be issued. Initially, the officers and directors of the corporation were members and employees of the law firm engaged to form the corporation. They resigned on

October 18, 1967, and the four promoters, together with a fifth person, attorney Samuel Lipman, became the officers and directors. Parsons was the president, Lipton the treasurer, Lipman the clerk, David Freedman the vice-president, and Louis Freedman the assistant treasurer. Those five constituted the board of directors.

Each of the promoters presented an offer to the board of directors to buy 130 shares of stock for $108,000.[7] Lipman offered to buy 120 shares of stock for $100,000. On October 19, 1967, the directors voted to accept the offers and to issue the stock upon receipt of the purchase price by the corporation. The stock certificates were dated October 19, 1967, but were issued in April, 1968. Upon such issue the total holdings of the four promoters comprised fifty-two per cent of the total authorized capital stock of the corporation. No cash was paid by the defendants for such stock. Lipman paid $100,000 in cash for the 120 shares issued to him. The per share value of no-par stock had previously been set at $833.

On October 28, 1967, Parsons conveyed the two parcels and assigned the option to the corporation for the total sum of $75,000. The transaction was neither embodied in a formal vote nor recorded in the records of the corporation.[8] The value of the land for use as a motel was $25,000 per acre (or about $150,000 for the entire site).

After the corporation was formed the promoters contracted for a second feasibility study and appraisal. That study confirmed that there was a need in the area for a motel such as was contemplated and projected it to be

---

[7] Lipton's stock was to be divided, sixty-five shares for himself and sixty-five shares for his wife. For the purposes of this opinion we shall treat the 130 shares as one block.

[8] Parsons, as president and a director of the corporation, sold two blocks consisting of forty-five shares each of previously unissued stock to an uncle and a sister for $37,500 each. The proceeds were retained by Parsons and were treated as payment for the property sold to the corporation. The corporate records disclose that the defendants voted to issue the two blocks to the uncle and sister for $37,500 each, receipt of payment from each was acknowledged, and certificates representing the stock were issued.

economically feasible. The two feasibility studies contained necessary information to be furnished to a bank or other lending institution from which financing for the project might be obtained. The promoters spent considerable time and money conferring with banks and insurance companies seeking a commitment for construction and permanent financing and, as a result, obtained various proposals for such financing. The corporation decided to accept the proposal offered by a syndicate consisting of several participating banks. As a condition, the syndicate required the promoters to furnish individual financial statements and subjected them to credit checks. On March 25, 1968, the corporation executed and delivered its promissory note in the amount of $1,130,000, payable to the lead bank of the syndicate and secured by mortgages of the corporation's property. Parsons, Lipton, and the Freedmans were required to and did endorse their individual guarantees upon the note. The guarantees were an important factor in the syndicate's decision to provide financing to the corporation. They were of value to the corporation; they also acted to impair the ability of the guarantors to borrow money. Those guarantees are still in force and effect.

The bank also required the corporation to deposit $300,000 with it and to pay from that amount the first $100,000 of construction bills. To raise that money the four promoters agreed to sell the remaining authorized but unissued stock at $833 a share. Most of that stock was then sold to ten outside investors at that rate. Some of the investors were informed that the promoters had invested their money in the purchase of stock; none of the outside investors was informed that the promoters had not paid cash for the 520 shares of stock issued to them.

The construction of the motel began in the spring of 1968 and was substantially completed in early July of that year.

Parsons was replaced as president at the annual meeting of the corporation in January of 1969 and resigned as a director on September 8, 1969. In April of 1969 Parsons had offered to sell the corporation his 130 shares of stock

for the sum of $108,000, but received no response to that offer. On July 7, 1969, at a monthly meeting of the board of directors, Parsons inquired whether the corporation or any of the individual members of the board would be interested in purchasing his stock. Again he received no response. Parsons then reduced his offering price to $100,000, and at a meeting of the board of directors on September 8, 1969, that offer was accepted. Thirty-eight shares of his stock were purchased for $29,000 in cash, and an agreement was made to pay the balance of $71,000 on or before July 31, 1970; the remaining ninety-two shares were then placed in escrow. At the same meeting, the offer of one of the outside stockholders to sell his nine shares to the corporation for $7,500 was accepted. These forty-seven shares were sold to the then president of the corporation, Samuel Katz, for $36,500. In October of 1969, Lipton became involved in financial difficulties and resigned as treasurer and director of the corporation on November 10. He and his wife assigned all of their assets, including the shares of the stock in the corporation, to trustees for the benefit of their creditors. It was at that time, the master found, that the outside investors first learned that none of the promoters had paid cash for their stock.

1. We first consider that part of the final decree in the first case which ordered Parsons and Lipton jointly and severally to pay $37,500 (plus interest) for "secret profits" received from the corporation on October 28, 1967, the date of the conveyance. That amount is the difference between the $75,000 paid to Parsons for the real estate and the $37,000 that Parsons had paid for the two parcels and $500 which had apparently been paid for the option.

The master found that Parsons' fellow promoters were aware of the price he had paid for the parcels and the option but that none of the outside investors was informed or was aware that the property had been acquired at that price. As a promoter, Parsons was a fiduciary in his dealings with the corporation and as such he would be liable for profits improperly made. *Hayward* v. *Leeson,* 176 Mass. 310, 321-322 (1900). *Old Dominion Copper Mining &*

*Smelting Co.* v. *Bigelow,* 188 Mass. 315, 320-321 (1905). *Keith* v. *Radway,* 220 Mass. 532, 535 (1915). *Hays* v. *The Georgian Inc.* 280 Mass. 10, 16 (1932). See Peairs, Business Corporations, § 223 (2d ed. 1971); Henn, Corporations, § 104 (2d ed. 1970); Ballantine, Corporations, § 356 (Rev. ed. 1946). See generally, on standards of fiduciary duty, *Donahue* v. *Rodd Electrotype Co. of New England Inc.* 367 Mass. 578, 592-597 (1975).

The corporation argues that the proper measure of damages is, as the court ruled, the difference between the sale price and Parsons' cost, citing *Hayward* v. *Leeson,* 176 Mass. 310, 321-322 (1900), in support of its position.[9] We think that, on the facts of this case, the use of that method of computing damages was incorrect.

We are of the opinion that the proper measure of damages here is the difference between the price paid by the corporation and the fair market value of the property at the time of the sale. The corporation recognizes that authority exists for such a position. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. 159, 202 (1909), aff'd 225 U. S. 111 (1912). See *Henderson* v. *Plymouth Oil Co.* 15 Del. Ch. 40, 74-75 (1925); Peairs, *supra,* § 223, at 425; Ballantine, *supra,* § 358. The property had been acquired by Parsons prior to the formation of the corporation and prior to its selection by the promoters as the site for the motel. It appears that the combined lots in their condition at the times of Parsons' acquisitions were unsuitable for the purposes of a motel. It was not until he, by his own efforts, had, among other things, obtained the discontinuance of a public way which ran through the property and secured extensions of water and sewer mains to service the property that the site was rendered suitable for such purpose. The amount of time and expense involved was not specifically found by the master. However, Parsons'

---

[9] Rescission would not be an appropriate remedy inasmuch as the land is no longer in the same condition it was in at the time of the sale. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. at 201.

efforts resulted in a parcel of land which had a fair market value of about $150,000.[10]

While we do not approve of the slipshod way in which the transaction was handled with respect to corporate votes concerning the acquisition of the property and the means by which Parsons received payment, it is nevertheless clear that the corporation received more than full value in return for the price it paid. While the outside investors were not informed of the details of the transaction, the master did not find, as the corporation contends, that Parsons actively misled the outside stockholders as to his cost or as to the sales price of the land to the corporation. The master did find that the deed from Parsons carried documentary stamps which indicated a sale price of $37,500.[11] We do not agree with the corporation's assertion that such was necessarily an affirmative misrepresentation of the sale price, as there are other equally persuasive explanations for the presence on the deed of that amount of documentary stamps. Absent more specific findings we consider that any conclusion, based on the amount of such stamps, would be speculative. *Commonwealth* v. *Shea,* 324 Mass. 710, 713-714 (1949).

The application of our holding that Parsons is accountable to the corporation only for the difference between the price paid by the corporation for the property and its fair market value at the time of its transfer to the corporation would not result in any positive difference. Hence that part of the decree charging Parsons and Lipton $37,500 was error.

2. The final decrees in the cases ordered Parsons, the

---

[10] It would appear that Parsons sought to have a credit for the excess value of $75,000 applied to payment of his stock subscription. The master's findings that he had agreed to sell the land to the corporation at the $75,000 price and that no part of the stock was issued to him in consideration of the conveyance preclude the allowance of such a credit.

[11] There is nothing in the master's report which would indicate that the outside investors were aware of the amount of the documentary stamps or what they might indicate.

Liptons' trustees and the Freedmans to surrender for cancellation the stock certificates representing all the shares of stock initially issued to them. Parsons was ordered to deliver the certificate for the remaining ninety-two shares held by him, to deliver for cancellation the $71,000 note of the corporation dated November 8, 1969, and to repay to the corporation the $29,000 (less a small credit not involved in this appeal) paid by the corporation to him.

The corporation contends that the relief granted was correct for two reasons: (a) the defendants are liable to the corporation for secret profits realized in the form of stock because of the breach of the promoters' fiduciary duties as promoters, directors, and corporate officers; and (b) as the stock was accepted on condition of payment and as the defendants have failed to pay for it, they are liable to the corporation for breach of their subscription agreements.

The defendants do not contend that $108,000 in cash was paid for each block of 130 shares, nor do they make any contention that the master did not properly determine the amount of the expenses incurred by each of the promoters. Their position is that the entrepreneurial services and the expenses of each promoter were the equivalent in value of that amount and that under G. L. c. 156B, § 18, as inserted by St. 1964, c. 723, § 1, the stock was properly issued for such services and expenses.[12]

It is apparent that such was the posture in which the case was tried before the master. At least one of the means by which the defendants sought to establish that value was through the testimony of an expert. The expert's opinion was expressed on the basis of facts contained in a hypothetical question. His opinion of value was admitted in evidence. However, the master in his report stated that he placed no value on that testimony as the facts assumed by

---

[12] That section provides, in pertinent part: "Capital stock may be issued for cash, tangible or intangible property, services or expenses." The value of the stock was found by the master to have been set by the promoters at $833 a share. That price was paid by all of the outside investors for the stock issued to them.

hypothesis had not been established. See *State Bd. of Ret.
v. Contributory Ret. Appeal Bd.* 342 Mass. 58, 66 (1961);
Hughes, Evidence, § 328, at 416-418 (1961). The defend-
ants' contention that we can override the master's deter-
mination of fact by ourselves examining a transcript of
testimony given before the master is without merit. *Albre
Marble & Tile Co. Inc.* v. *Goverman,* 353 Mass. 546, 547
(1968). *Boxborough* v. *Joatham Spring Realty Trust,* 356
Mass. 487, 489, and n. 1 (1969). Mottla, Civil Practice,
§ 1133 (3d ed. 1962).

The master made no finding that there was any intention
on the part of the promoters to deceive or defraud the
outside investors, and we infer that there was none. None-
theless, it was the duty of the promoters either to inform
the investors that the stock had been issued for services
and expenses and not for cash, or to obtain the ratification
of such issuance at a later time upon a complete revelation
of the facts to the outside stockholders or to an indepen-
dent board of directors. *Hayward* v. *Leeson,* 176 Mass. at
318-319. *Old Dominion Copper Mining & Smelting Co.* v.
*Bigelow,* 203 Mass. at 178-179. *Hays* v. *The Georgian Inc.*
280 Mass. at 16-17. Peairs, *supra,* § 223, at 426. Having
failed to do either, they are accountable to the corporation
for the profits realized. *Hayward* v. *Leeson,* 176 Mass. at
322. *Old Dominion Copper Mining & Smelting Co.* v. *Bige-
low,* 203 Mass. at 179. Ballantine, *supra,* § 362, at 849-850.

Moreover, the promoters and the corporation entered
into a subscription contract by virtue of the board's accep-
tance of the promoters' offers on October 19, 1967. A failure
on the part of the promoters to pay the agreed price would
render them liable for the deficiency or for the return of
that part of the stock for which no consideration was given.
*Bridgeport Window Hardware Co.* v. *Osborne,* 222 Mass.
517, 523 (1916). *Buckman* v. *Gordon,* 312 Mass. 6, 9-10
(1942). The offers which were accepted by the corporation
spoke of payment in terms of cash, not in terms of services
and expenses. However, we are of the opinion that to limit
credit on the stock subscriptions to cash payments would
amount to a rank injustice to the promoters. All of the

extensive efforts of the promoters, which culminated in the issuance of a motel franchise and the transfer of the product of their labors to the corporation, accrued to the benefit of the corporation. All of those efforts were undertaken prior to the actual issuance of stock to the promoters. Depriving the promoters of credit for their contribution to the value of the corporation through services and expenses would preclude them from any participation in the corporation and would unjustly enrich the equity of the outside investors.

As the defendants' liability has been established under either theory advanced by the corporation, we hold on the facts of this case that the measure of damages for which the defendants are accountable to the corporation is the difference between the value of each block of shares at the time of issue and the fair value of the services rendered and expenses incurred by each promoter which benefited the corporation. See *Hayward* v. *Leeson,* 176 Mass. at 322; *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. at 202; *Mason* v. *Carrothers,* 105 Maine 392, 410 (1909); *Nebraska Mausoleum Co.* v. *Matters,* 108 Neb. 618, 627 (1922); Peairs, *supra,* § 223, at 425. Compare *Shulkin* v. *Shulkin,* 301 Mass. 184, 192-194 (1938).

As we have noted, it is apparent that the cases were tried on the basis of so crediting the promoters. To establish the amount of the credit it appears that the promoters relied heavily on the opinion of the expert, which was accorded no weight by the master. Although finding that the promoters had spent considerable time and money in furtherance of the project and that the promoters were the only persons who did, the master made no finding whatsoever with respect to the value of their services. He did find that the guarantees on the note by all four promoters were of value but stated that on the evidence he was unable to find that value. While finding in several parts of the report that the services and guarantees of the promoters had value, he failed to find a specific value because "of a lack of any evidence bearing upon this issue" (the value of the guarantees). "[N]o evidence was established to

compute the value of these guarantees" and "I am unable to ascertain with any degree of certainty . . ." (the value of the Freedmans' services). Having sought so to excuse himself the master placed no specific value on any of the promoters' services. Where "[t]he market value of the property could not be proved with mathematical certainty . . . [it] must ultimately rest in the realm of opinion, estimate and judgment." *Assessors of Quincy* v. *Boston Consol. Gas Co.* 309 Mass. 60, 72 (1941). It appears to us that the master did not attempt to make a determination of specific value on this basis.

"Where the facts on which the rights of the parties depend have not been ascertained at the trial, it is within the power of the court, in its discretion and on its own motion, to recommit the cause for a retrial." *Turgeon* v. *Turgeon*, 326 Mass. 384, 386 (1950), citing *DeVeer* v. *Pierson*, 222 Mass. 167, 175 (1915).

We consider this to be a proper case in which to exercise that discretion. The evidence to be taken on rehearing is to be limited to the determination of the value of the services of the several promoters. As those are matters of affirmative defense, the burden is upon each promoter to prove the amount of credit to which he may be entitled. *Reilly* v. *Selectmen of Blackstone*, 266 Mass. 503, 511 (1929). See *Pahigian* v. *Manufacturers' Life Ins. Co.* 349 Mass. 78, 85 (1965); *Three Sons Inc.* v. *Phoenix Ins. Co.* 357 Mass. 271, 278 (1970). Whether the rehearing should be before the court or before a master is for the Superior Court to determine.

3. Insofar as it may become important after rehearing, we rule that there was no error in that part of the final decree in the first case which determined Lipton to be jointly liable with Parsons. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. at 201.

The final decrees are reversed. The cases are remanded to the Superior Court for further proceedings and the entry of judgments in accordance with this opinion.

*So ordered.*

This case was argued before the Chief Justice and Justices Rose and Keville and was thereafter submitted on the record and briefs to all the other Justices.

KEVILLE, J. (dissenting).   From the findings of the master and the reasonable inferences which may be drawn therefrom, I reach the following conclusions:

1. It is obvious that the promoters, when they subscribed for their stock for "cash," and paid no cash, were relying upon outside stockholders for the seed money to provide the initial financing. The source of the $300,000 deposit required by the banks before they would furnish the ultimate financing for the construction of the motel came from the payments made to the promoters by the outside stockholders for their shares. This dependency upon outside cash furnishes a significant explanation for the failure of the promoters[1] to make full disclosure to the outside stockholders that they had not in fact paid cash, and their misrepresentation to those individuals that they had paid cash for their stock.

The master found that the promoters had not agreed among themselves or with the corporation upon a method to compensate themselves for services to the corporation. It is significant that their claim for services came only after the disclosure of their misrepresentation that they had paid cash for their stock. That revelation resulted from an order for an audit following personal financial difficulties suffered by one of their number (Lipton) who had resigned as treasurer and director.

Not only did the promoters have a contractual obligation by virtue of their subscription agreements to pay cash for their stock[2] (*Bridgeport Window Hardware Co.* v. *Osborne,*

---

[1] At the time of their concealment and misrepresentation, they were not only promoters but officers, directors, and collectively, owners of a majority (52%) of the corporation's authorized stock. See generally, *Donahue* v. *Rodd Electrotype Co. of New England, Inc.* 367 Mass. 578, 586, 587-588, 592-597 (1975).

[2] Parsons now claims that he should be credited with the difference ($75,000) between his sale price of the real estate to the corporation

222 Mass. 517, 520-523 [1916]; *Buckman* v. *Gordon,* 312 Mass. 6, 9-10 [1942]; compare *H. B. Humphrey Co.* v. *Pollack Roller Runner Sled Co. Inc.* 278 Mass. 350, 352-353, 356 [1932]), but more importantly, they stood in a fiduciary relation to those persons who were to invest in the enterprise as future stockholders. In the absence of full disclosure that they were claiming remuneration for promoters' services, they could not honestly make such a claim without the approval of the outside stockholders. *Hayward* v. *Leeson,* 176 Mass. 310, 318-320 (1900), and cases cited.

Since it would have been improper in the first instance for the promoters to have made payment for their stock in the form of organizational services without full disclosure, I find no basis for the validity of their claim of credit for those services made only after the outside stockholders had learned of their misrepresentations that they had paid cash for their stock. For the reasons just stated, the repurchase by the corporation of Parsons' shares stands on the same footing. That transaction was also tainted by the misrepresentation that he had paid cash for his stock.

I, therefore, feel obliged to part company with the majority view that it would be "rank injustice" to limit credit on the promoters' stock subscriptions to cash payments and that the cases should be remanded to give them an opportunity to receive credit for their services to the corporation. In the circumstances, the promoters were entitled to claim only reimbursement for their expenses in organizing the corporation. *Hayward* v. *Leeson, supra,* at 322. The master found that Parsons had been reimbursed by the corporation for his expenses and the final decree in the first case gives credit to Lipton for his expenditures in behalf of the corporation. No finding was made, apparently, that the Freedmans had incurred such expenses.

and its value ($150,000) as found by the master — in payment for stock which he had initially agreed to pay for in cash. That was, of course, not part of his agreement with the corporation, and he may not now rely upon consideration for the stock in the form of services which was not a part of his original bargain with the corporation. Compare *Blair* v. *F. H. Smith Co.* 18 Del. Ch. R. 150, 160-162 (1931).

2. Much of the same reasoning is applicable to the issue whether Parsons may rightly retain his profit from the sale of his real estate to the corporation. With respect to that transaction, he and his fellow promoters stood in a fiduciary relation to the corporation and future stockholders. In the absence of full disclosure, he was not entitled to retain his secret profit. *Hayward* v. *Leeson, supra,* at 321, 322. *Kane* v. *Klos,* 50 Wash. 2d 778, 789 (1957). Restatement, Restitution, § 197, p. 808 (1937). The true nature of that transaction was concealed by the devious maneuver of causing corporate shares to be issued to an uncle and a sister of Parsons, payment for which was made to him rather than to the corporation in the sum of $75,000, the sale price of his real estate to the corporation. No corporate record was made of the transaction, no vote of approval was taken by the directors, nor was the transaction ratified by the stockholders. At the time of the sale, Parsons was not only a promoter but an officer and director of the corporation as well.

Parsons seeks to justify the transaction by reliance upon the master's finding that the real estate was worth approximately $150,000. In my view that consideration is irrelevant. It is no defense against a claim by the corporation for secret profits realized by a promoter in the sale of property to the corporation that the property was worth as much as or more than the corporation paid for it. *Victor Oil Co.* v. *Drum,* 184 Cal. 226, 237 (1920). Compare *Moore* v. *Warrior Coal & Land Co.* 178 Ala. 234, 242 (1912). See *Frick* v. *Howard,* 23 Wis. 2d 86, 91-94 (1964). Restatement, Restitution, § 197, comment (c), pp. 809-810 (1937).

I see no necessity for remanding the cases to the Superior Court. I would affirm the final decrees.