WHALER MOTOR INN, INC. *vs.* RICHARD H. PARSONS
& others[1]
(and a companion case[2]).

Bristol.   October 5, 1976. — May 31, 1977.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Corporation,* Liability of promoter, Officers and agents. *Fiduciary.*
*Contract,* Subscription for corporate shares. *Damages,* For breach
of fiduciary duty.

Promoters of a corporation who failed to disclose to outside investors
that they had not paid cash for corporate shares and that the cor-
poration had purchased land from one of the promoters breached
their fiduciary duty to the corporation. [625-627]
Although a promoter breached his fiduciary duty to a corporation by
failing to disclose to outside investors that he owned land purchased
by the corporation, the promoter was entitled to retain his profit
from the transaction, where he had originally acquired the land for
his own use and where the corporation had substantially benefited
from its purchase of the land. [627-630]
Promoters who breached their fiduciary duty to a corporation by failing
to disclose to outside investors that they had not paid cash for their
corporate shares were obliged to return the shares to the corporation
but were entitled to receive credit for their promotional services as
well as for their actual expenditures. [627-630]

Two BILLS IN EQUITY filed in the Superior Court on May
28, 1970, and September 14, 1970, respectively.

The suits were heard by *Zarrow,* J., on a master's report.

After review by the Appeals Court, the Supreme Judi-
cial Court granted leave to obtain further appellate review.

*Howard M. Miller* for Whaler Motor Inn, Inc.

*Robert W. Harrington* (*John M. Doukas* with him) for
Richard H. Parsons.

---

[1] Remaining as additional parties defendant are Nathaniel Lipton,
Shirley Lipton, and the several trustees for the benefit of creditors of
the Liptons.

[2] Whaler Motor Inn, Inc. *vs.* David Freedman & another.

*Thomas F. McGuire* for David S. Barnet & others, trustees.

*John A. Tierney* for David Freedman & another.

KAPLAN, J.   We granted further appellate review of decisions of the Appeals Court, reached by a five to one vote of the Justices of that court, reversing decrees of a judge of the Superior Court, which pose questions as to the duties of "promoters" and, in case of a breach of duty, as to the measure of damages to be cast. Relegating the procedural history of these cases and certain matters of detail to footnotes,[3] we block out the facts as they emerge from the subsidiary findings of the master[4] who tried the cases on reference from the Superior Court.

In late 1965, the defendant Nathaniel Lipton, an accountant, introduced his client, the defendant Richard H. Parsons, to other clients, the defendants David Freedman and Louis Freedman, all experienced businessmen. The four (hereafter called the promoters) commenced to meet and make plans toward building and operating a motel somewhere in the New Bedford area. By early 1966, the promoters had made visits to a number of motels for pur-

---

[3] The first entitled action sought payment for stock allegedly issued without payment, or, in the alternative, cancellation thereof; an accounting to recover secret profits on the sale of certain real estate; and cancellation of a promissory note of the corporation given to the defendant Parsons in connection with the repurchase by the corporation of certain shares originally issued to him. By way of counterclaim, Parsons sought enforcement of the note. In the second action the corporation sought cancellation of stock allegedly issued without payment.

The master, to whom the consolidated cases were referred, filed a report which was recommitted for a summary of evidence; that having been supplied, the report was confirmed, and decrees followed, to be described below.

The Appeals Court, with one Justice dissenting, reversed the final decrees and remanded the cases for a fresh hearing as to damages. *Whaler Motor Inn, Inc.* v. *Parsons,* 3 Mass. App. Ct. 662 (1975). (Additional procedural details and specifics of the decrees are at 663-665). We allowed an application for further appellate review of the cases.

[4] The Appeals Court observed that the master made only subsidiary findings. *Whaler Motor Inn, Inc.* v. *Parsons, supra* at 666 n.6. A court of review is free to use such findings to draw its own conclusions. *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975).

poses of self-education, and were sufficiently interested to decide to take further preliminary steps. Selection of the exact site was obviously important, so the promoters, besides inspecting and discussing several possible sites, contracted for a "feasibility study" by the Real Estate Research Corporation. The report was delivered in November, 1966. They reached the conclusion that the most promising location was on Hathaway Road, near Route 140, in the city of New Bedford. Parsons had earlier intended to build a motel at that location on his own, and had bought a parcel there as far back as 1964 for some $2,000. In July, 1966, before the feasibility report and before there was agreement on the site, Parsons bought a larger parcel for $35,000 and secured an option on a third parcel. He also made arrangements with the city for discontinuing a public way and for utility connections that looked to eventual construction.

Meanwhile the promoters were concerning themselves with choosing a franchiser for their venture. After travel to Tennessee, New York, Connecticut, and other places, they settled on a "Holiday Inn" franchise.

On February 14, 1967, the promoters caused the plaintiff corporation to be formed with 1,000 no par shares authorized. Officers and directors were installed consisting of members of the law firm retained by the promotors. When in October, 1967, plans were approaching realization — the promoters were seeing to the financing of the project and meeting with a building contractor — it was deemed advisable to remove the "dummy" officers and directors and to replace them with the promoters and Samuel Lipman, a person who was interested in making an investment. This was accomplished at a meeting of the board of directors actually held on October 18, 1967.[5] Record was made of another meeting, nominally held the following day, at which each of the promoters offered to purchase 130 shares

[5] This was the only formal meeting of the board of directors or stockholders actually held from the time of incorporation until December 2, 1968.

for $108,000 (a total of 52% of the authorized shares) and Lipman offered to purchase 120 shares for $100,000, and the offers were accepted on behalf of the corporation. The promoters did not in fact pay cash for their shares then or later; Lipman paid cash for his shares on November 14, 1967.

On October 28, Parsons, pursuant to informal agreement with the other promoters, conveyed the two parcels and option to the corporation at an understood price of $75,000. Considering the advantages of the location for motel purposes, the master found the fair market value of the properties to be $150,000. Evidently no record of the transaction was made apart from the conveyance proper. The stamps on the conveyance indicated a price of $37,500 and it is indicated that Parsons treated the sale accordingly on his personal income tax return.

The problem of financing the venture was now to be got over. The promoters commissioned a second feasibility report and appraisal for use with lenders. After negotiating with a number of institutions, the promoters closed with a syndicate of banks headed by the First Federal Savings and Loan Association of Attleboro. In consideration of the banks' loan, the corporation on March 25, 1968, gave its promissory note for $1,130,000 secured by mortgage. This was required to be, and was guaranteed personally by each of the promoters. The corporation was obliged to deposit $300,000 with the banks, of which $100,000 would be used to make the first payments for construction.

Investors were brought in to purchase most of the remaining 360 shares whose price was established (as in the case of Lipman) at $833 a share. Record was made of a special meeting of the board of directors on April 2, 1968, at which certificates for 520 shares were issued to the promoters and 120 shares to Lipman (all, however, dated October 19, 1967); and certificates were also issued to the outsiders for which cash was paid. Parsons used the money paid for shares by two outsiders (actually his relatives) to cover $75,000 owing to him for the land. The fund of $300,-000 required by the banks was evidently made up out of

the remaining cash contributions from the outsiders including the Lipmans. Construction of the motel was completed in the summer of 1968.

Business reverses of the promoter Lipton led to an accounting which revealed that the promoters had not paid cash for their shares. This precipitated the present lawsuits on dates in 1970.

With respect to the promoters' claim in the litigation that they paid for their shares by their services in addition to their out-of-pocket expenditures — services being a legal method of payment, see G. L. c. 156, §§ 14, 15; c. 156B, § 18 — it is fair to say that the promotional and related activities, as found by the master, were extensive, and, of course, indispensable to the launching of the enterprise. The master found cash outlays by Parsons of $18,453 (almost fully reimbursed by corporate funds) and by Lipton of $31,433 (less than half reimbursed). He could not figure the Freedmans' expenditures on the evidence presented (they had loaned a substantial sum to the corporation as yet unpaid). For want of proof he did not attempt to place a value on the promoters' personal guaranties, still outstanding. Evidence was offered of the value of the entrepreneurial efforts by the promoters viewed as a whole, but the master apparently thought it too "hypothetical" to go by.

There was no disclosure by Parsons or the other promoters to the outsiders that the land on which the motel was built had been sold by Parsons to the corporation. But there is no indication that the promoters misrepresented the fact to the outsiders.

The promoters did not disclose to the outsiders that they had not paid cash for their shares. It is possible to say that such corporate records as existed would have suggested to a reader that cash had been paid, although an audit would show it had not been; but it is not indicated that any outsider consulted the records before buying. On the score of misrepresentations by the promoters, the master said that they stated to outsiders at various times that they were investing money in the purchase of stock. The master cited an instance in which there was mention of

an investment of $100,000 by each promoter, and another instance where the promoters were said to be giving their services to the venture without charge. If these statements are to be characterized as lies, they are nevertheless equivocal in their nature, for the promoters had expended money and could assume that their services had value; on the other hand they were not making specific charges for their services.

The nub of the final decrees of the judge of the Superior Court was that there were breaches of duty and that the proper remedy was to restore the shares to the corporation[6] allowing credit only for the unreimbursed out-of-pocket expenditures incurred by the promoters; and with respect to the land, to require the return to the corporation of all consideration received by Parsons above his own costs, that is, $37,500. This was also the view taken by the dissenting Justice of the Appeals Court. The majority of that court agreed there were breaches of duty, but held that credit should be allowed for the value (to be ascertained on remand) of the promotional services as well as for the promoters' unrepaid actual expenditures, and that, as to the land, there need be no payment to the corporation since the market value exceeded the price received by Parsons. 3 Mass. App. Ct. 662, 670, 672, 674-676, 678-679 (1975). We agree with the majority and largely for their reasons.

1. We agree that whatever their own understanding of the situation may have been, the defendants must be held

---

[6] If the shares were not returned, the corporation was authorized to cancel them.

The corporation agreed in September, 1969, to buy back Parsons's shares for $100,000. Thirty-eight shares were purchased for $29,000 cash; the remaining ninety-two shares were placed as an escrow and Parsons received the corporation's promissory note for $71,000 payable on or before July 31, 1970. The decree in effect voided the repurchase transaction and then effected a rescission of the original acquisition of the shares as indicated in the text.

Under severe pressure from Lipman, the Freedmans at one point gave backdated notes totaling $216,000 in belated payment for their shares. The corporation has not demanded payment of the notes, but has rather demanded cancellation of the shares. See note 8, *infra*.

to have committed breaches of duty toward the corporation and thus to the outsiders. In transactions with their corporate instrument, promoters are considered to be fiduciaries. See *Keith* v. *Radway*, 220 Mass. 532, 535 (1915). We need not speculate just what kind of fiduciaries they are. Note, Inadequacy of Traditional Concepts in the Treatment of the Promoter, 81 U. Pa. L. Rev. 746, 747 (1933). To fulfil their responsibilities, the defendants in the present cases were bound to make full disclosures about the two transactions (land and shares) to the outsiders as intending investors. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 178 (1909), aff'd, 225 U.S. 111 (1912); *Hayward* v. *Leeson*, 176 Mass. 310, 320-322 (1900). Failing that, the promoters might have exculpated themselves if, after the corporation was firmly established and under sail, they had secured due and knowing ratification of their actions by the shareholders or by an independent management. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow, supra*; *Parker* v. *Boyle*, 178 Ind. 560, 567 (1912). We need not renew the problem whether or how far a subsequent shareholder may complain of a transaction between promoters and the corporation concluded at a time when the promoters owned all the issued (though not all the authorized) stock.[7] It is not suggested that there is any such complication here.

---

[7] In the *Old Dominion* cases (*Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 188 Mass. 315 [1905], 203 Mass. 159 [1909], aff'd, 225 U.S. 111 [1912]), we held that a promoter was liable on a transaction of sale to the corporation even though that occurred at a time when he held all the then issued shares, the corporation retaining authorized shares which were intended to be sold to outside investors. The United States Supreme Court ruled on the same facts that the corporation had no right of action against the promoter. *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn,* 210 U.S. 206 (1908). Our rule has been the more popular. Brockelbank, Compensation of Promoters, 13 Or. L. Rev. 195, 211 (1934); McGowan, Legal Controls of Promoters' Corporate Profits, 25 Geo. L.J. 269, 282 (1937). For subsequent developments in the Supreme Court, see McGowan at 283-288.

There is a suggestion in our cases that the corporation has no claim if the promoter at the time owned all the shares authorized and issued (*Old Dominion,* 203 Mass. at 178; *Hays* v. *Georgian, Inc.,* 280 Mass. 10, 17 [1932]), but that notion has not escaped criticism. McGowan at 276-278.

It may be noted that problems of the common law liability of pro-

2. Seeking to delineate remedies for corporations commensurate with promoters' breaches of duty, we can be sure that any rigid rules would soon be shown to be vulnerable, so great is the variety of circumstances likely to arise and beyond our powers to foresee or appreciate. It is well to proceed more modestly, with no hope of finding invariant precepts. Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579, 588 n.6, second paragraph (1973).

What the Appeals Court did was to treat the cases as appropriate for the remedy of rescission or, in the case of the shares, a remedy on the order of rescission though not quite the usual article. Parsons received $75,000 for his conveyance but if this transaction were undone (substituting a money value for the land and land interests) the corporation would be a loser, so rescission resulted here in a null recovery for the corporation. The shares issued to the promoters were to be returned to the corporation (or cancelled, which is the same thing for present purposes), and the corporation was to return to the promoters, not the price they had paid the corporation, for they had paid none, but rather the promoters' expenses and the value of their services in launching the venture, which could figure in a sense as that price, or as a reasonable substitute for it.[8]

Similar results typical of rescission or in that mode can be found in promoters' cases decided by this and other courts. Thus for failure to make proper disclosure, sales of property by promoters to their corporations have been undone by requiring return of the thing or its value against

---

moters as fiduciaries have been largely dormant since the enactment of Federal securities legislation in the 1930's. See W.L. Cary, Corporations 1042 (4th ed. 1969).

[8] It was suggested that each of the promoters might have been held on his "subscription contract" to pay $108,000 for the shares which he would then retain. Although the original pleading in one of the actions contained such a prayer in the alternative (see note 3 *supra*), it appears to have been abandoned in the course of the litigation, and an alternative recovery has been sought involving return or cancellation of the shares. It may be assumed that the remedy finally sought was more favorable for the corporation, i.e., the outsiders.

return of the price paid by the corporation. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 188 Mass. 315, 328 (1905), 203 Mass. 159, 202 (1909), aff'd, 225 U.S. 111 (1912); *Commonwealth S.S. Co.* v. *American Shipbuilding Co.*, 197 F. 797, 814-815 (N.D. Ohio 1912), modified and aff'd, 215 F. 296 (6th Cir. 1914); *Hebgen* v. *Koeffler*, 97 Wis. 313, 320 (1897).[9] So too, promoters required to restore unpaid-for shares to the corporation have been allowed as a credit not only their actual promotional expenditures but also the value of their promotional services as determined. See *Mason* v. *Carrothers*, 105 Me. 392, 410 (1909); *American Forging & Socket Co.* v. *Wiley*, 206 Mich. 664, 675 (1919); *Nebraska Mausoleum Co.* v. *Matters*, 108 Neb. 618, 627 (1922). The degree of explicitness as to the theory that is being applied varies considerably in these cases.[10]

Much authority can be cited in which harsher measures have been applied to promoters guilty of failure to disclose. Thus in an instance of sale of property to the corporation, the promoter may be deprived of every advantage, as by making him disgorge all that he has received exceeding his own investment in the property, even if such an exaction involves a windfall to the corporation (a result that would follow in the present case if the decrees in the Superior Court were upheld). See *Koppitz-Melchers, Inc.* v. *Koppitz*, 315 Mich. 582, 586, 590-591 (1946); *Cuba Colony Co.* v. *Kirby*, 149 Mich. 453, 458 (1907); *Wills* v. *Nehalem Coal Co.*, 52 Or. 70, 81-82 (1908). And there are decisions which, in the process of rescission, would not allow the value of promotional services to count as any part of the "price" for shares issued to the promoter (although they may treat actual promotional expenditures

---

[9] See also *Masberg* v. *Granville*, 201 Ala. 5, 7 (1917). Cf. *Parker* v. *Nickerson*, 137 Mass. 487, 497 (1884); *Densmore Oil Co.* v. *Densmore*, 64 Pa. 43, 50-51 (1870); *Milwaukee Cold Storage Co.* v. *Dexter*, 99 Wis. 214, 226-229 (1898).

[10] Compare *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, supra, *Commonwealth S.S. Co.* v. *American Shipbuilding Co.*, supra, *Hebgen* v. *Koeffler*, supra, with *Masberg* v. *Granville*, supra.

otherwise, a somewhat awkward distinction also to be found in the Superior Court decrees).[11] See *Hayward* v. *Leeson,* 176 Mass. 310, 318, 322 (1900); *Torrey* v. *Toledo Portland Cement Co.,* 158 Mich. 348, 353-354 (1909); *Cuba Colony Co.* v. *Kirby, supra* (apparently also disallowing expenditures).

We observe, however, that where corporations have been permitted the more sweeping remedies described, certain features are likely to be present. The promoter, in a case of sale to the corporation, is understood to be acting for the venture rather than himself at the earlier point when he acquired the property, so that he cannot in conscience take any profit for himself. See *Koppitz-Melchers, Inc.* v. *Koppitz, supra*; *Wills* v. *Nehalem Coal Co., supra.*[12] Or the promoter is conspicuously blameworthy, for example, because of his active misrepresentations on which the outsiders relied to their detriment. See *Hayward* v. *Leeson, supra* at 320-321; *Cuba Colony Co.* v. *Kirby, supra*; *Torrey* v. *Toledo Portland Cement Co., supra*; *Goldman* v. *Cosgrove,* 172 Wis. 462, 469-470 (1920). Such features may have been influential in the decisions cited in the Appeals Court dissent.[13] 3 Mass. App. Ct. at 679 (1975). As already suggested, however, the cases do not fall into clearcut categories.

We join with the Appeals Court in deploring the behavior of the promoters from the formation of the corporation to the crisis leading to the litigation. They were slipshod and assumed an attitude of proprietorship toward the project without proper regard to the interests of the

---

[11] As indicated in the text earlier, there is no inherent vice in paying for shares with services. Of course out-of-pocket expenditures are more definite, and can be more easily visualized as a cost, than the provision of services.

[12] Cf. Restatement of Trusts (Second) § 206, Comments e, g (1959); 2 A. Scott, Trusts § 170.12 at 1327-1328 (3d ed. 1967); 3 *id.* § 206.

[13] Note the facts and characterizations in *Hayward* v. *Leeson,* 176 Mass. 310, 320 (1900); *Moore* v. *Warrior Coal & Land Co.,* 178 Ala. 234, 242 (1912); *Victor Oil Co.* v. *Drum,* 184 Cal. 226, 230-231 (1920); *Frick* v. *Howard,* 23 Wis. 2d 86, 87-88 (1964); *Kane* v. *Klos,* 50 Wash. 2d 778, 789 (1957).

outsiders. But it is not every sin that suffices to make a party a wolf's head. Cf. *Town Planning & Eng'r Assocs. Inc.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 746-747 (1976). Thus, despite weighty argument in the dissent, we join also with the Appeals Court in thinking that these cases do not call for measures quite as drastic as those taken by the decrees of the Superior Court. As to the land transaction, Parsons's acquisition in 1964 was surely for himself, and according to the findings his later purchase and other activities in connection with the site occurred before there was solid assurance of a market for the land. Having assumed individual risks, Parsons was entitled to an individual profit on the subsequent sale to the corporation. That profit was small in relation to the benefit obtained by the corporation. As to the shares, with proof of misrepresentations or their consequences at the ambiguous level described,[14] we think promoters' services (including exposure on the guaranty to the banks), so far as valuable to the enterprise, should not be disregarded: they deserve recognition on much the same footing as out-of-pocket expenditures. We would emphasize, however, that the burden of showing value remains on the promoters as wrongdoers and the trier should insist on clear proof. A remand to reassess damages appears justified because of the uncertain handling of the subject by the master in light of the applicable rules.

The final decrees of the Superior Court are reversed and the actions remanded to the Superior Court for the purpose mentioned.

*So ordered.*

---

[14] We intimate no opinion whether investors, on a demonstration that they were misled to their injury, might have individual claims against the promoters. See 1 G. Hornstein, Corporation Law and Practice § 94 (1959). Cf. *McCandless* v. *Furlaud,* 296 U.S. 140, 167 (1935).