PARTNERSHIP EQUITIES, INC.[1] & another[2] *vs.*
JAMES F. MARTEN
(and a companion case[3]).

Norfolk.   October 15, 1982. — December 14, 1982.

Present: KASS, ROSE, & SMITH, JJ.

*Uniform Limited Partnership Act.   Partnership,* Limited partnership: lia-
bility of subscriber.

Alleged misconduct by general partners, consisting essentially of misman-
agement and unauthorized acts in breach of an Ohio limited partner-
ship agreement, did not, under the Uniform Limited Partnership Act
as in effect in that State, excuse two limited partners from paying in-
stallments of the capital contributions to which each had subscribed,
where the certificate of limited partnership, as publicly filed, placed
no conditions on the obligation of limited partners to make the con-
tributions and where the breach alleged fell short of a profound failure
of consideration.   [44-46]
Discussion of limited partnerships and the extent of the obligation of a
subscriber to a limited partnership.   [46-50]

CIVIL ACTIONS commenced in the Superior Court on
February 3, 1976.

The cases were consolidated for trial and were heard by
*Murphy,* J.

---

[1] Partnership Equities, Inc., is a general partner of Columbia-Heather,
Ltd., in whose behalf the action was brought.   Partnership Equities, Inc.,
is a successor by assignment to the interests of Columbia Properties, Inc.,
a coplaintiff in the original complaint.

[2] Jack L. Wallick, a general partner of Columbia-Heather, Ltd.

[3] The companion case was brought by the same plaintiffs against Amin
J. Khoury.   Marten and Khoury are limited partners of Columbia-
Heather, Ltd.   Separate complaints were filed, but, by agreement of the
parties, the trial judge treated the two actions as consolidated for purposes
of decision.   He did, however, enter separate judgments, and two appeals
were entered in this court and consolidated for purposes of briefing and
argument.

*Herbert M. Linsenberg* for the defendants.

*William J. Rooney, Jr.* (*Peter D. Hanson* with him) for the plaintiffs.

KASS, J.  Under the amended agreement of limited partnership to which they subscribed, Amin J. Khoury and James F. Marten were each obligated to contribute $83,750 to the capital of Columbia-Heather, Ltd., a limited partnership organized under Ohio law.  That partnership was engaged in the construction of a 110-unit apartment project in Toledo financed with a mortgage loan insured by the Federal Housing Administration.  As is the mode in "tax shelter" deals — and this was one — the obligation of limited partners to contribute cash to capital was sweetened by permitting them to make payments in installments.[4] Khoury and Marten each paid his initial contribution of $2,750 and his second and third contribution of $20,250 (due on October 1, 1973, and October 1, 1974, respectively), but balked as to payments of $20,250 due on October 1 of 1975 and 1976.  They based their refusals on a claimed breach of a term of the partnership agreement by the general partners.  A Superior Court judge ruled that the breach alleged, even if proved, did not, under § 17 of the Uniform Limited Partnership Act, 6 U.L.A. 601 (1976) (ULPA),[5] in effect in Ohio, excuse payment of the capital contributions to which Khoury and Marten had subscribed.

---

[4] Since each limited partner could take a pro rata deduction for depreciation and other accounting losses based on the entire basis of the partnership property (i.e., borrowed and invested capital), the deferral of cash contributions had the effect of producing income tax savings which defrayed a substantial part of subsequent payments when they became due.  See Kashner, Financing Limited Partnerships and their Partners: Caveat Creditor, 37 Bus. Law. 171 (1981).

[5] Appearing with insignificant changes in Ohio Rev. Code Ann. § 1781.17 (Baldwin 1982).  The cognate provision in Massachusetts is G. L. c. 109, § 17, as inserted by St. 1923, c. 112, § 1.  A revised Uniform Limited Partnership Act was approved by the National Conference of Commissioners on Uniform State Laws in 1976 and enacted in Massachusetts by St. 1982, c. 202, § 1.  The revised act has not been adopted in Ohio.

Judgment entered for the plaintiff partnership against each of the defendants in the amount of $40,500, and from those judgments they appeal. We affirm.

Section 17 of ULPA provides that, "(1) A limited partner is liable to the partnership . . . (b) [f]or any unpaid contribution which he agreed in the certificate [this refers to the certificate required to be filed in a public place][6] to make in the future at the time *and on the conditions stated in the certificate*" (emphasis supplied). An amended certificate of limited partnership, undated but filed April 1, 1973, called for the periodic contributions to capital but imposed no conditions. Compare *March Co.* v. *Vernalia,* 9 Mass. App. Ct. 849 (1980), in which an installment of capital contributions was conditioned on the truth of certain warranties and representations.

It is the defendants' position that the payment obligation of § 17 of ULPA is not absolute, i.e., that the statute does not mean what it says, and that it is an inherent condition of further capital contributions that there be no material breach by other partners of the partnership agreement at the time additional money is due. Although the payment obligation imposed by statute may not be absolute, the circumstances in which payment of further capital contributions are excused are few and they are narrow. Payment may be excused when there has occurred a failure to meet a condition expressed in the certificate of limited partnership or when there has been a profound failure of consideration such as a repudiation of, or fraud incident to, the essentials of the venture to which subscription was made.

If their enrollment in the partnership were merely a bilateral agreement between the defendants and the general partners, the principle of contract law upon which the defendants rely, that a material breach excuses nonperform-

---

[6] In Ohio, with the office of the recorder of the county in which the principal place of business of the partnership is located. Ohio Rev. Code Ann. § 1781.02 (Baldwin 1982). In Massachusetts, in the office of the State Secretary. G. L. c. 109, § 2, as inserted by St. 1923, c. 112, § 1.

ance might well apply. Restatement (Second) of Contracts § 237 (1979). Relations of a limited partner to the partnership, however, are more complex in that other limited partners and third parties rely on an expressed obligation, made public by filing, to contribute resources to the partnership. Taking the instant case as an example, the party providing mortgage financing may well have depended in part on capital subscriptions in appraising the resources of the partnership to meet project expenses in excess of mortgage financing. Similarly, prospective investing limited partners may have calculated the aggregate capital to be invested in judging whether they should invest in the transaction being undertaken by the partnership. See Hurd & Mayer, Ohio Limited Partnerships — Business Use and Effect, 27 Ohio St. L.J. 373, 382 (1966); Kashner, Financing Limited Partnerships and Their Partners: Caveat Creditor, 37 Bus. Law. 171, 181-182. Thus, in *Whitley* v. *Klauber,* 69 A.D.2d 99, 105-107 (1979), aff'd, 51 N.Y.2d 555 (1980), a judgment creditor of a limited partnership was permitted to maintain an action against limited partners to the extent of their withdrawn capital contributions. See also *Donroy, Ltd.* v. *United States,* 301 F.2d 200, 205 (9th Cir. 1962). Contrast *Bell Sound Studios, Inc.* v. *Enneagram Prod. Co.,* 36 Misc. 2d 879, 880 (N.Y. Civ. Ct. 1962).

Concern for the interest of other partners, limited and general, and for creditors, is reflected in § 17(3)[7] of ULPA, which provides:

> "The liabilities of a limited partner as set forth in this section can be waived or compromised only by the consent of all the members [of the partnership]; but a waiver or compromise shall not affect the right of a creditor of a partnership who extended credit or whose claim arose after the filing and before a cancellation or amendment of the certificate, to enforce such liabilities."

---

[7] Section 17(3) appears in the Ohio statutes, Ohio Rev. Code Ann. § 1781.17(C), with insignificant variations from the provision as approved by the National Conference of Commissioners on Uniform State Laws.

This solicitude that the partnership received the infusion of capital to which limited partners have committed themselves would be effectively subverted if one or more limited partners could refuse to make installment payments of capital because they had a quarrel with the general partners, a quarrel to which other limited partners and third parties might not be parties.

To the extent that the revised ULPA (see note 5, *supra*) may illuminate cognate provisions in the original 1916 act, it reinforces the conclusion that generally only conditions stated in the filed certificate of limited partnership will excuse payment of capital contributions previously subscribed to.   Section 502(a) of the revised ULPA (it appears in Massachusetts as G. L. c. 109, § 28[a], as inserted by St. 1982, c. 202, § 1) provides:

> "Except as provided in the certificate of limited partnership, a partner is obligated to the limited partnership to perform any promise to contribute cash or property or to perform services, even if he is unable to perform because of death, disability or any other reason. If a partner does not make the required contribution of property or services, he is obligated at the option of the limited partnership to contribute cash equal to that portion of the value (as stated in the certificate of limited partnership) of the stated contribution that has not been made."

A provision substantially similar to § 17(3) of the 1916 act, requiring the consent of all partners in order to compromise obligations due from a limited partner and permitting creditors to enforce the original uncompromised obligation if their claims arise before an amended certificate reflecting the compromise has been filed, also appears in § 502(b) of the revised ULPA.

It is helpful to an analysis of the reasonable expectations of limited partners and construction of ULPA to glance at

the origins of the limited partnership as a form of business organization and the purposes for which it has come to be most often used. Limited partnerships first developed in the middle ages as a means by which nobility and clergy could make a discreet and limited investment without suffering the obloquy of anything so crass as publicly engaging in trade. The untidy business of commerce was left to the general partners, who were of the merchant class. Lewis, The Uniform Limited Partnership Act, 65 Pa. L. Rev. 715, 716-717 (1917). Even after the modern business corporation attained currency as the means by which persons might invest in an enterprise without risking more than their investment, the limited partnership continued to enjoy utility when a greater measure of privacy was desirable, or when the credit of the general partners was advantageous to the venture. See generally *id.* at 717-718. The adoption of ULPA by forty-two States, the District of Columbia and the Virgin Islands (see 6 U.L.A. 117 [Master ed. Supp. 1982]) much enhanced the utility of limited partnerships by sharply reducing the circumstances in which limited partners might lose their limited liability. See Lewis, *supra* at 723-724; Comment, The Substantial Compliance Doctrine: Preserving Limited Liability Under the Uniform Limited Partnership Act, 13 U.C.D.L. Rev. 924, 926-928 (1980). More recently, the opportunity to pass profits and, especially, losses directly to the limited partners, because a limited partnership is not usually treated as a separate tax entity for Federal income tax purposes, has resulted in large growth in the number and size of limited partnerships. Particularly to seize that advantage, the limited partnership has become the favored vehicle for passive investments in real estate ventures. Hecker, Limited Partners' Derivative Suits Under the Revised Uniform Limited Partnership Act, 33 Vand. L. Rev. 343, 343-344 (1980).[8]

---

[8] As the Hecker article calls to attention (at 344), prior to the enactment of the Tax Reform Act of 1976 and the Revenue Act of 1978, the limited partnership was also the favored form of organization for speculative investment in oil and gas, timber, equipment leases, motion pictures, phonograph records and cattle.

Relatively little case law has developed under ULPA, perhaps because the limited partnership only became widely used as an investment vehicle in the last two decades. We have found no cases construing the provision in § 17 of ULPA regarding the obligations of limited partners to make the unpaid capital contributions to which they have subscribed. We have remarked, however, the affinity of purpose between the limited partnership and the business corporation. The status of a limited partner as analogous to that of a stockholder has not gone unnoted by courts and commentators. See *Klebanow* v. *New York Produce Exch.*, 344 F.2d 294, 297 (2d Cir. 1965); *Strain* v. *Seven Hills Associates*, 75 A.D.2d 360, 365 (N.Y. 1980); Standing of Limited Partners to Sue Derivatively, 65 Colum. L. Rev. 1463, 1465 (1965). It is appropriate, therefore, to look to cases involving stock subscriptions for assistance in measuring the extent of obligation of a subscriber to a limited partnership.

Just as a limited partner's obligations under § 17 of ULPA may be excused upon failure of a condition stated in the certificate, so a subscriber to stock of a corporation may be absolved if the condition upon which the subscription is made is not performed or does not occur. *Goodisson* v. *North American Sec. Co.*, 40 Ohio App. 85, 96-98 (1931). *Berger* v. *Callander*, 81 F.2d 687, 688 (3d Cir. 1936). 4 Fletcher, Cyclopedia of the Law of Private Corporations § 1531 (rev. perm. ed. 1965). In the instant case, as we have seen, no condition was set forth in the certificate.

Mismanagement or unauthorized acts of the corporate officers — the essence of the charge here by the defendants against the general partners — or disappointed expectations cannot be set up to defeat collection of a stock subscription. *Cravens* v. *Eagle Cotton Mills Co.*, 120 Ind. 6, 13 (1889). *Cornhusker Dev. & Inv. Group, Inc.* v. *Knecht*, 180 Neb. 873, 881-882 (1966). *Buffalo & Jamestown R.R.* v. *Gifford*, 87 N.Y. 294, 301-302 (1882). Fletcher, *supra* §§ 1778,

1785, 1904, 1917 & 1921.[9] So in *Cornhusker, supra,* the court required the defendant, who argued failure of consideration, to pay the balance of his stock subscription because he did not prove that the plans to build nursing homes had been repudiated. Failure of consideration, in the context of an obligation to make a contribution of capital subscribed to, implies that the venture to which the subscriber committed himself has failed to materialize in a manner resembling what was represented to the subscriber. A failure of consideration does not occur because a subscriber has not received an incidental benefit he expected to receive. Fletcher, *supra* § 1423. Cf. *Elmcreek Ditch Co.* v. *St. John,* 127 Neb. 253, 256 (1934), where the very purpose of the stock subscription was to get water to the subscriber's land and the failure so to do was seen as going to the core of the transaction and excusing payment.

In the instant case the project has been built and is being operated. The defendants Khoury and Marten have already received tax benefits, and they have offered no evidence that the general partners will cause the partnership not to pay a return on investment. A failure by the general partners to take any steps at all in furtherance of the apartment complex venture would, no doubt, have constituted a failure of consideration which would excuse further capital contributions. Such a state of facts would suggest the general partners had either repudiated the deal or had defrauded the limited partners. See *Whaler Motor Inn, Inc.* v. *Parsons,* 3 Mass. App. Ct. 662, 674 (1975), *S.C.,* 372 Mass. 620 (1977). Imposing liability on the defendants does not, therefore, require surrender to the straw man which the defendants erect in their brief, viz., that "even if the General Partners had absconded with the Limited Partners' initial contributions, without putting any money into the

---

[9] See also *Proprietors of the City Hotel* v. *Dickinson,* 6 Gray 586, 594-595 (1856) (ultra vires acts); *Drake Hotel Co.* v. *Crane,* 210 Mo. App. 452, 463 (1922) (diversion of assets); *Old Colony Sec. Corp.* v. *Sahlin,* 179 Wash. 690, 693-694 (1934) (mismanagement).

construction of the Project, the General Partners still could have compelled the Limited Partners to pay the remainder of their subscriptions." Distinguishing between repudiation or fraud, on the one hand, and, on the other, mismanagement, negligence, diversion of some assets, action beyond authority, or failure to perform certain elements of an agreement is not beyond a court's capacity.

For the latter category of causes, derivative suits are the appropriate remedy. See *Lichtyger* v. *Franchard Corp.*, 18 N.Y.2d 528, 536-537 (1966), in which the court said, "There is no basis or warrant for distinguishing the fiduciary relationship of corporate director and shareholder from that of general partner and limited partner . . . . To permit stockholders to bring a representative suit but to deny the same privilege to limited partners would be highly unreasonable." See also *Strain* v. *Seven Hills Associates*, 75 A.D.2d at 365-366. Hecker, Limited Partners' Derivative Suits Under the Revised Uniform Limited Partnership Act, 33 Vand. L. Rev. at 346-355. The instant case illustrates the aptness of that remedy in most cases. If, as the defendants claim, the general partners have prematurely reimbursed themselves on account of certain development costs which they advanced, then all the limited partners and third parties dealing with the partnership have a lively interest in seeing to it that the general partners pay the money back. Withholding unpaid capital contributions may not necessarily induce return of the allegedly diverted funds because the resulting economic pinch may be felt more by the partnership and its creditors than by the general partners. It is also a consideration that, under the subscription contract, the defendants enjoyed the status of limited partner upon making their first payments and, according to financial information appearing in the record, would have enjoyed substantial benefits by way of passed through losses. Compare *Goodisson* v. *North American Sec. Co.*, 40 Ohio App. at 89, 93-94, where the subscriber was not yet a stockholder of record and delivery of the shares subscribed to had become a legal impossibility.

The principles set forth in this opinion do not place at any particular disadvantage investing limited partners who desire to hold future contributions of capital hostage to a certain level of performance or compliance by the general partners. If conditions are to be placed on the payment of future installments, it is only necessary to articulate them in the limited partnership agreement and to include those conditions in the certificate of limited partnership filed with a public officer. *March Co.* v. *Vernalia*, 9 Mass. App. Ct. 849 (1980). See generally *Wasserman* v. *Wasserman*, 7 Mass. App. Ct. 167, 174-175 (1979).

*Judgments affirmed.*