United States Court of Appeals,

Eleventh Circuit.

No. 94-2858.

IN RE:   The SECURITIES GROUP 1980, et al., Debtors.

DAYTON SECURITIES ASSOCIATES, et al., Plaintiffs-Appellants,

BEATRICE COOKSON, Plaintiff-Appellant,

v.

SECURITIES GROUP 1980;  RICHARD SETH STALEY, Defendants,

LOUIS LOWIN, Trustee for the Securities Group 1980;  THE MONETARY GROU; THE SECURITIES GROUP, Defendants-Appellees.

Feb. 12, 1996.

Appeals from the United States District Court for the Middle District of Florida.  (Nos. 91-994-Civ-J-20, 85-214), Harvey E. Schlesinger, District Judge, George J. Proctor, Bankruptcy Judge.

Before ANDERSON and CARNES, Circuit Judges, and OWENS[*], Senior District Judge.

ANDERSON, Circuit Judge:

The former limited partners of three limited partnerships appeal the district court's affirmance of two decisions of the bankruptcy court.[1]  For the reasons set forth in this opinion, we affirm in part, vacate in part, and remand for further proceedings.

I. BACKGROUND

A. *Facts*

The appellants are former limited partners in three New York limited partnerships:  The Securities Group ("TSG"), The Monetary

---

[*]Honorable Wilbur D. Owens, Jr., Senior U.S. District Judge for the Middle District of Georgia, sitting by designation.

[1]*See In re The Securities Group 1980,* 124 B.R. 875 (Bankr.M.D.Fla.1991) *and In re The Securities Group 1980,* 91 B.R. 143 (Bankr.M.D.Fla.1988).

Group ("TMG"), and The Securities Group 1980 ("TSG 80") (collectively, the "Limited Partnerships"). The Limited Partnerships were the general partners of The Securities Groups ("Groups"), a New York general partnership. Groups and the Limited Partnerships were formed by Charles Agee Atkins ("Atkins") to engage in various investment activities.

The appellants became limited partners by making initial capital contributions and agreeing to make additional capital contributions to the Limited Partnerships (the "Additional Capital Commitment"). The Additional Capital Commitment was memorialized in both the signed limited partnership agreements and the certificates of limited partnership, which were filed in New York County, New York. If necessary to satisfy the recourse obligations of the Limited Partnerships, all limited partners agreed to be personally and severally liable to contribute to their respective partnerships an amount up to three times their initial capital contributions. The limited partners were obligated to make these additional capital contributions on demand, after receiving a written capital call from the Limited Partnerships.

The limited partners anticipated significant tax benefits as a result of their investments. Specifically, the potential liability created by the limited partners' Additional Capital Commitment enabled the limited partners to take tax write-offs equal to four times their cash investment. In 1982, however, changes in the tax laws brought an end to these tax benefits, and many limited partners wished to sell their partnership interests.

Atkins and others created a new partnership under New York

law, TSG Partners, to purchase the limited partnership interests in TSG, TMG, and TSG 80. On November 15, 1982, TSG Partners offered to purchase all of the interests of the limited partners of TSG, TMG, and TSG 80 for an amount equal to 105 percent of the net asset value of the Limited Partnerships as of September 30, 1982. TSG Partners also offered to assume the selling limited partners' *future* responsibility for the Additional Capital Commitment. The limited partners were advised, however, that if they accepted the tender offer they would still be responsible for the existing liabilities and obligations of the Limited Partnerships. The tender offer provided:

> As soon as practicable after the Closing Date, the [Limited] Partnerships intend to file amendments to their respective Certificates of Limited Partnership to delete the Sellers as Limited Partners. *This will not affect the rights of then existing creditors of the Partnerships, who may have the right to make a direct claim against a Seller for up to the amount of his Additional Capital Commitment if the Partnerships do not pay such creditors.*

*In re Securities Group 1980,* 124 B.R. at 879 (quoting TSG Partners' tender offer) (emphasis added).

The vast majority of the limited partners accepted the tender offer.[2] On January 3, 1983, the appellants and TSG Partners consummated the tender offer transaction. As partial consideration for the sale, TSG Partners issued promissory notes to the appellants. On April 1, 1983, TSG Partners paid the appellants five percent of the note amount. No further amounts on the notes

---

[2]The limited partners who did not accept the tender offer and remained in the Limited Partnerships are not parties to this litigation. The appellants are the limited partners who accepted the tender offer. Where applicable, the appellants will be referred to as the "former limited partners."

were paid.

B. *Procedural History*

On May 25, 1984, TSG, TMG, TSG 80, and Groups each filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division. Louis Lowin was appointed Chapter 11 trustee of the bankruptcy estates. On August 15, 1985, the trustee made a written demand on all limited partners and former limited partners of TSG, TMG, and TSG 80 for payment of a portion of their Additional Capital Commitment sufficient to repay the Limited Partnerships' creditors in full. The limited partners refused to honor the trustee's capital call.

The bankruptcy court confirmed Chapter 11 plans of controlled liquidation for Groups, TSG, TMG, and TSG 80. Pursuant to such confirmed plans, the trustee, as post-confirmation administrator of the bankruptcy estates, began marshalling assets and property for the benefit of the estates and their creditors. The present action began as four adversary proceedings filed in bankruptcy court by the trustee. The bankruptcy court consolidated the four adversary proceedings for trial on April 5, 1988.

Following trial, the bankruptcy court entered final judgment against the appellants. *In re Securities Group 1980,* 124 B.R. 875 (Bankr.M.D.Fla.1991). The court held the appellants jointly and severally liable to contribute additional capital, in an amount up to three times their initial capital contributions, to satisfy the Limited Partnerships' recourse debt obligations that existed on the date of the appellants' withdrawal. *Id.* at 897. The court found

that the appellants' withdrawal from the Limited Partnerships became effective with respect to creditors on January 3, 1983, and determined that the Limited Partnerships' unpaid obligations to creditors as of January 3, 1983, totalled $16,114,038.00. *Id.* at 888. To this figure the court added $4,513,697.00 in "pre-judgment interest," calculated at the New York statutory rate of 9% per annum from December 18, 1987, through January 28, 1991, for a new total of $20,627,735. *Id.* at 888; *see also id.* at 895. Finally, the court deducted $2,140,751.38, the value of the assets of Groups, TSG, TMG, and TSG 80 as of January 28, 1991, for a final damages figure of $18,486,983.62. *Id.* at 889.[3]

The appellants appealed the bankruptcy court's judgment to the district court. On June 10, 1994, the district court affirmed the final judgment of the bankruptcy court in all respects, with little discussion.

## II. ISSUES ON APPEAL

In this opinion we address the following issues:

(A) Whether the bankruptcy court erred in holding the appellants liable under New York Partnership Law § 106(1)(b).

(B) Whether the bankruptcy court erred in its calculation of damages by holding the appellants liable for two lease claims, where the leases were executed while the appellants were limited partners but where the default in the rent occurred after the appellants withdrew.

(C) Whether the bankruptcy court properly included a claim of the

_____

[3]Although the bankruptcy court's opinion is unclear, it appears that the $2,140,751.38 figure constituted the "net" assets of Groups, TSG, TMG, and TSG 80 after certain administrative expenses had been deducted. The court also stated that further administrative expenses, as they became finalized, would be deducted from the $2,140,751.38 figure. Any remaining partnership assets after the deduction of administrative expenses would be distributed to creditors. *Id.* at 889.

Federal Deposit Insurance Corporation in the damages calculation.

(D) Whether the bankruptcy court erred when it added interest to the allowed claims of creditors.

(E) Whether the bankruptcy court erred in failing to apply certain settlement proceeds to reduce the appellants' overall liability.

(F) Whether the bankruptcy court erred in subordinating the appellants' RICO and securities fraud claims to the creditors' claims against the Limited Partnerships.

## III. STANDARD OF REVIEW

We review the bankruptcy court's factual findings for clear error. *In re Sublett,* 895 F.2d 1381, 1383 (11th Cir.1990). We review *de novo* conclusions of law by either the bankruptcy court or the district court. *Id.*

## IV. DISCUSSION

A. *The Appellants Are Liable Under Section 106(1)(b), New York Partnership Law*

The bankruptcy court held the appellants liable to contribute additional capital pursuant to New York Partnership Law § 106(1)(b) (McKinney 1988), which makes limited partners liable to the partnership for their promised capital contributions, on the conditions stated in the publicly-filed limited partnership certificate. We affirm the appellants' liability under § 106(1)(b).[4] The certificates of limited partnership for TSG, TMG,

---

[4]The record indicates that the appellants' potential liability under § 106(1)(b) for the Additional Capital Commitment overwhelmingly exceeds the aggregate amount of creditors' claims against the Limited Partnerships, which have been fixed by a confirmed, non-appealable Chapter 11 plan. In light of this disposition, we need not address the other grounds upon which the bankruptcy court and the district court held the appellants liable. Specifically, we do not address the holding that the limited partnership agreements imposed a contractual obligation onto the appellants to make additional capital contributions.

and TSG 80 all state that, if necessary to satisfy the partnership's recourse obligations, each limited partner has agreed, upon demand, to make an additional capital contribution of up to three times the limited partner's original investment. These certificates were recorded publicly in New York County. Accordingly, the capital of the Limited Partnerships upon which creditors properly could rely included the limited partners' stated obligation to make additional capital contributions. *See Arno Management Corp. v. 115 East 69th Assocs.,* 173 A.D.2d 258, 260, 569 N.Y.S.2d 656, 657 (1st Dept.1991) (holding that the information contained in the certificate of limited partnership binds the partnership and the partners with respect to third parties).

Section 106(1)(b) explicitly provides a means of enforcing a limited partner's capital commitments that are expressed in the certificate of limited partnership. It provides:

> (1) A limited partner is liable to the partnership
>
> .    .    .    .    .
>
> (b) For any unpaid contributions which he agreed in the certificate to make in the future at the time and on the conditions stated in the certificate.

N.Y. Partnership Law § 106(1)(b) (McKinney 1988). Pursuant to this statutory provision and the terms of the publicly recorded certificates, the trustee's capital call triggered each limited partner's obligation to contribute additional capital to the partnerships.

---

Nor do we address the holding that the appellants' sale of their limited partnership interests in the tender offer transaction constituted a "return of capital" under N.Y. Partnership Law § 106(4) (McKinney 1988).

Although § 106(1)(b) speaks of a limited partner's liability to the partnership, it is clear that § 106(1)(b) also serves to protect the legitimate expectations of creditors with regard to a limited partner's promised capital contributions. New York Partnership Law § 106(3) provides:

> The liabilities of a limited partner as set forth in this section [§ 106] can be waived or compromised only by the consent of all members; but a waiver or compromise shall not affect the right of a creditor of a partnership, who extended credit or whose claim arose after the filing and before a cancellation or amendment of the certificate, to enforce such liabilities.

N.Y. Partnership Law § 106(3) (McKinney 1988). Moreover, the fact that the appellants sold their limited partnership interests more than two years before the trustee's capital call does not affect their liability for the additional contributions under § 106(1)(b). New York Partnership Law § 108(7) provides:

> The substitution of the assignee as a limited partner does not release the assignor from liability to the partnership under §§ 95 and 106.

N.Y. Partnership Law § 108(7) (McKinney 1988). Plainly, the limited partners' assignment of their interests, and the substitution of new limited partners, did not release the original limited partners from their liability under § 106(1)(b)—at least with respect to creditors who extended credit or whose claims arose before the limited partnership certificates were amended.

The appellants attempt to avoid liability under § 106(1)(b) by arguing that their obligation to contribute additional capital was eliminated by fraud on the part of the partnerships and their general partners. The appellants base their fraud defense upon the following events. In 1987, Atkins and several other general

partners[5] were convicted of income tax fraud arising out of activities related to the partnerships. *See United States v. Atkins,* 869 F.2d 135 (2nd Cir.) (affirming Atkins' conviction), *cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 39 (1989). Atkins and the others were convicted for using "rigged straddles" and "rigged repurchase agreements" to create fraudulent income tax losses, which were then passed through to investors such as the appellants. Although the appellants apparently were unaware of the general partners' criminal wrongdoing, the Internal Revenue Service disallowed all of the appellants' previously-taken tax losses.

The appellants' fraud argument relies heavily on dicta expressed in *Partnership Equities, Inc. v. Marten,* 15 Mass.App.Ct. 42, 443 N.E.2d 134 (1982), which involved § 17(1)(b) of the 1916 Uniform Limited Partnership Act ("ULPA").[6] The *Partnership Equities* case involved two limited partners who had agreed to make annual capital contributions to a partnership engaged in the construction business. Alleging that the general partners had breached a term of the limited partnership agreement, the limited partners refused to make their scheduled capital contributions. The court held that, despite any alleged breach of the limited partnership agreement by the general partners, ULPA § 17(1)(b) and the publicly-filed certificate of limited partnership obligated the limited partners to make their capital contributions as scheduled.

---

[5]Other general partners, including Robert Gubitosi, Kenneth Kaltman and Steven Hageman, entered guilty pleas for the same conduct.

[6]New York Partnership Law § 106 is identical to § 17 of the 1916 Uniform Limited Partnership Act.

*See id.* 443 N.E.2d at 134.

The court explained the difference between a limited partnership agreement, which is a bilateral contract between partners, and a certificate of limited partnership, which is a publicly recorded document relied upon by creditors and others. Under traditional contract law principles, a general partner's breach of a limited partnership agreement might excuse a limited partner's further performance under the agreement. However, ULPA § 17(1)(b) protects creditors who rely on the certificate of limited partnership, a public expression of the limited partners' obligation to contribute additional resources to the partnership. *Id.* at 136. In light of such creditor reliance, a material breach of the limited partnership agreement—including mismanagement or unauthorized acts of the general partners, or disappointed expectations—would not excuse a limited partner's commitment to contribute additional capital on the conditions stated in the certificate. *Id.* at 138; *see also Arno,* 173 A.D.2d at 260, 569 N.Y.S.2d at 657 ("Where ... the liability of a limited partnership to a third party is in issue and the certificate of limited partnership materially contradicts an agreement by and among the partners, the partnership and its members are estopped to dispute the information contained in the certificate.").

The limited partners in the *Partnership Equities* case were not excused from their statutory obligation to contribute additional capital. Nevertheless, the court commented that, under some circumstances, a limited partner might avoid payment of promised contributions. The court stated:

> Although the payment obligation imposed by statute may not be absolute, the circumstances in which payment of further capital contributions are excused are few and they are narrow. Payment may be excused when there has occurred a failure to meet a condition expressed in the certificate of limited partnership or when there has been a profound failure of consideration such as a repudiation of, or fraud incident to, the essentials of the venture to which the subscription was made.

*Id.* 443 N.E.2d at 136. The appellants argue that the general partners' tax fraud convictions, which caused the appellants to lose their previously-recognized tax losses, constitute "a repudiation of, or fraud incident to" the essential purpose of the Limited Partnerships. Accordingly, they seek to be excused from their statutory obligation to repay the Limited Partnerships' creditors.

We need not decide whether to follow the dicta expressed in *Partnership Equities.* In light of § 106(1)(b)'s strong statutory purpose to favor creditors over limited partners, we readily conclude that the appellants have not demonstrated the degree of fraud that might implicate the dicta in *Partnership Equities.* Therefore, we hold that the bankruptcy court committed no error in holding the appellants liable to make additional contributions pursuant to New York Partnership Law § 106(1)(b).

B. *The Lease Claims*

The bankruptcy court held the appellants liable only for those obligations of the Limited Partnerships that were outstanding as of the date that the appellants withdrew; the court found that the appellants' withdrawal from the Limited Partnerships became

effective on January 3, 1983 (the "Withdrawal Date").  [7]  The appellants argue that the bankruptcy court erred by holding them liable for two lease claims; they argue that those debts "arose" after the Withdrawal Date.

The first disputed lease claim was asserted by The Equitable Life Assurance Society of the United States ("The Equitable"). On December 31, 1979, Groups leased from The Equitable office space at 500 Park Avenue in New York. The lease became effective on February 15, 1980, and would expire on March 1, 1990. In July 1983, Groups became in arrears on its lease payments to The Equitable. The second disputed lease claim was asserted by 767 Third Avenue Associates ("767 Third Avenue"). On August 9, 1982, Groups, TSG, TMG, and TSG 80 all agreed jointly and severally to guarantee a five year lease entered by Groups' affiliate, Ameribond Securities Associates ("Ameribond"). Ameribond entered the lease in 1981, and defaulted under the lease in August 1983.

The bankruptcy court held the appellants liable for the debts owed to The Equitable and to 767 Third Avenue, reasoning that the landlords and the Limited Partnerships entered the leases long

_____

[7]In its findings of fact, the bankruptcy court determined that "[t]he rights of creditors against the defendants were not affected until April and July 1983 when Limited Partnership Certificates were amended to show the withdrawal of the defendants." *In re Securities Group 1980,* 124 B.R. at 879 n. 3. This proposition is certainly correct. However, the bankruptcy court analyzed the lease claims as if the limited partners' withdrawal became effective immediately on the date that the tender offer was consummated, January 3, 1983. *See, e.g., id.* at 892. It is not apparent to us that either of the lease claims for which the appellants were held liable would be treated differently if the limited partnership certificates were amended on January 3, 1983. Therefore, we will analyze the lease claims under the assumption that the limited partnership certificates were actually amended on January 3, 1983.

before the appellants' withdrawal.  The appellants assert that, under New York law, a debt under a lease does not "arise" until the default in rent occurs.  Because the Limited Partnerships did not miss any rent payments until after the Withdrawal Date, the appellants argue that they cannot be held liable for the lease claims.

The bankruptcy court correctly rejected the appellants' argument.  At the time the leases were entered, the certificates of limited partnership stated that, if necessary to satisfy the recourse obligations of the Limited Partnerships, the appellants agreed to contribute an amount up to three times their initial capital contributions.  Because § 106(1)(b) obligated the appellants to contribute additional capital in accordance with the terms of the certificates, the landlords were entitled to rely on the certificates in determining whether to extend credit by leasing their properties.  It would make little sense to allow the appellants to deprive the landlords of their right to rely on the certificates by withdrawing from the partnerships while the leases were still in effect.  New York Partnership Law § 106(3) prevents such an absurd result.

Section 106(3) explicitly protects creditors "who extended credit *or* whose claim arose after the filing and before a cancellation or amendment of the certificate." N.Y.Partnership Law § 106(3) (McKinney 1988) (emphasis added).  Under this statutory provision, even if a debt to a partnership creditor "arises" after the limited partner's withdrawal, the withdrawn limited partner is nevertheless liable for the debt if the creditor "extended credit"

before the amendment of the limited partnership certificate.  In this case, the landlords "extended credit" long before the certificates were amended to reflect the appellants' withdrawal from the Limited Partnerships.  Thus, even if the debts under the leases "arose" after the appellants withdrew, the appellants are liable for the lease claims under the "extension of credit" prong of § 106(3).

Our holding with respect to the lease claims is compelled by the language of §§ 106(1)(b) and 106(3), and we believe that the courts in New York would reach the same result.  In *Whitley v. Klauber,* 51 N.Y.2d 555, 435 N.Y.S.2d 568, 416 N.E.2d 569 (1980), New York's highest court explained the "strong" and "crystal clear" creditor protection policy underlying New York Partnership Law § 106, although in a different context.  In light of the strong statutory policy to protect creditors, the court broadly construed § 106(4).[8]  *Whitley* involved a partnership in which all of the general and limited partners sold their partnership interests to a third party in exchange for some stock.  The plaintiff, who became a creditor of the partnership prior to the sale, sought to hold the limited partners liable under § 106(4) on the theory that they had received a "return of capital."  The court agreed that the limited

---

[8]Section 106(4) provides:

> When a contributor has rightfully received the return in whole or in part of the capital of his contribution, he is nevertheless liable to the partnership for any sum, not in excess of such return with interest, necessary to discharge its liabilities to all creditors who extended credit or whose claims arose before such return.

N.Y. Partnership Law § 106(4) (McKinney 1988).

partners had received a "return of capital" under § 106(4), even though they sold their partnership interests to a third party. *See id.* 435 N.Y.S.2d at 571, 416 N.E.2d at 572 ("[P]rimary in the determination whether a particular transaction constitutes a return of capital is not the limited partner's purpose or intent or how the transaction is structured but its effect upon partnership creditors.").

The *Whitley* court supported its holding by referring to *Kittredge v. Langley,* 252 N.Y. 405, 169 N.E. 626 (1930) (Cardozo, C.J.), another case in which the interests of a partnership's creditor prevailed over those of its limited partner. *Kittredge* held that a partnership creditor may hold a limited partner liable to the extent of his withdrawn capital contribution even "where, at the time of the withdrawal of his capital contribution, the assets left with the general partners are sufficient at a fair valuation to discharge the outstanding liabilities, but have become inadequate thereafter." *Id.* 169 N.E. at 631. The court reasoned that the limited partner, not the creditor, should bear the risk that the partnership's assets could become worthless:

> A case may be supposed where a special partner receives in cash his capital contribution, the general partners retaining property sufficient at a fair valuation to pay the debts in full, but the next day or the next hour the property is destroyed by earthquake, flood, or fire. The conclusion is hardly thinkable that the special partner may keep the cash, and leave the creditors with nothing. His contribution, like the capital of a corporation, and to a similar extent, is to be treated as a trust fund for the discharge of liabilities....

*Id.* The strong policy to protect creditors cited in *Whitley* and *Kittredge* is also evident in §§ 106(1)(b) and 106(3). Therefore, we hold that the appellants are liable for the two disputed lease

claims.

We disagree with the appellants' argument that *59th and Park Assocs. v. Inselbuch,* 68 A.D.2d 838, 414 N.Y.S.2d 537 (1st Dept.1979) compels a different result. In *Inselbuch,* a partnership in 1969 executed a fifteen year lease for two floors of a building. One of the partners at the time the lease was entered, Klineman, withdrew from the partnership in 1972. In March 1974, the remaining partners executed a "surrender agreement" with the landlord, under which the landlord purported to reserve all rights under the lease. Some years later, the landlord sued several former partners (including Klineman) to recover unpaid rent that became due after March 1974. Because the 1974 surrender agreement superseded the 1969 lease, the court held that the landlord's rights "could be derived only from the terms of the surrender agreement...." *Id.,* 68 A.D.2d at 839, 414 N.Y.S.2d at 539. Because Klineman was not a party to the surrender agreement, the court held that Klineman could not be bound by its terms. *Id. See also id.* (Fein, J., concurring) ("With respect to Klineman, I concur only upon the ground that the execution and delivery of the surrender agreement, at a time when there was no default and when he was no longer a partner, terminated any contingent liability he may have had since it affected whatever rights he had under the lease, without his consent."); *id.,* 68 A.D.2d at 840-41, 414 N.Y.S.2d at 540 (Lupiano, J., concurring) (explaining that because "the termination of the lease effectively discharged Klineman from any of his obligations thereunder," and because Klineman was not a party to the surrender agreement, there was "no basis to predicate

liability against Klineman").

Thus, *Inselbuch* 's holding is that the surrender agreement terminated any rights the landlord might have had against Klineman under the lease. The majority opinion, however, also states that Klineman could not be held liable under the lease because "there was no debt at the time of [Klineman's] withdrawal." *Id.,* 68 A.D.2d at 838-39, 414 N.Y.S.2d at 538. The court explained that, under New York law, the obligation in a lease to pay rent does not create a "debt" until the time stipulated for payment arrives. *See id.*[9] Thus, Klineman could not be held liable for the missed rent payments, despite having been a partner when the lease was signed, because he withdrew from the partnership before the time stipulated for payment. *Id.*

We decline the appellants' invitation to apply this dicta from *Inselbuch* to the instant situation, primarily because *Inselbuch* does not address the effect of New York Partnership Law § 106. As we have stated, *supra,* § 106(3) makes a former limited partner

---

[9]The court cited *Barbro Realty Co. v. Newburger,* 53 A.D.2d 34, 385 N.Y.S.2d 68 (1st Dept.1976) for this proposition. *Barbro* held that a partner who joins a partnership during the term of a pre-existing lease is personally liable for the partnership's rent payments while he or she is a partner. *Id.,* 53 A.D.2d at 36, 385 N.Y.S.2d at 70 ("The lease agreement may have been executed prior to the entry of the defendants into the partnership, but the defendants, who were partners at the time of the default, may be held personally liable therefor." (citing *Glassman v. Hyder,* 23 N.Y.2d 354, 296 N.Y.S.2d 783, 785, 244 N.E.2d 259, 261 (1968) (holding that future rent is not attachable under statute providing that a debt is not attachable unless it is certain to become due) and *In re Ryan's Estate,* 294 N.Y. 85, 60 N.E.2d 817, 821 (1945) (life beneficiary of a trust, who was a party to a lease and who died before lease term expired, did not fail to pay his debts during his lifetime; the lease's covenant to pay rent did not become a "debt" until the rent was due, and no rent was unpaid at the time of his death))).

personally liable to a partnership creditor who "extended credit" to the partnership prior to the amendment of the limited partnership certificate—even if the creditor's claim "arises" *after* the certificate is amended. Moreover, *Inselbuch* is a lower court opinion that was issued before *Whitley v. Klauber,* 51 N.Y.2d 555, 435 N.Y.S.2d 568, 416 N.E.2d 569 (1980) articulated the "crystal clear" creditor protection policy underlying New York Partnership Law § 106.

Accordingly, we hold that the bankruptcy court did not err in holding the appellants liable for the lease claims asserted by The Equitable and 767 Third Avenue.

C. *The Federal Deposit Insurance Corporation's Claim*

In addition to disputing the lease claims, the appellants argue that the bankruptcy court improperly held them liable for a $7,014,103 claim of the Federal Deposit Insurance Corporation as receiver of the Southern California Savings and Loan Association. The bankruptcy court's order allowing the FDIC's claim was tried separately. On appeal, the district court reversed and disallowed the FDIC's claim in its entirety. This Court affirmed the district court. *In re The Securities Groups, Dayton Securities Assocs., et al. v. Federal Deposit Insurance Corp.,* No. 92-2572, 35 F.3d 576 (11th Cir. August 31, 1994).

The judgment against the appellants must be reduced by $7,014,103 to reflect the disallowed claim. We VACATE that portion of the lower courts' opinions allowing the FDIC's claim and REMAND with instructions to modify the judgment accordingly.

D. *Interest*

In calculating the damages for which the appellants were to be held liable, the bankruptcy court determined that the Limited Partnership obligations incurred prior to January 3, 1983 (including the now-disallowed FDIC claim) amounted to $16,114,038. The bankruptcy court then added $4,513,697 in interest to this figure. *See In re The Securities Group 1980,* 124 B.R. at 888-89, 895. The appellants contend that the bankruptcy court committed reversible error when it added this interest.

The bankruptcy court derived its authority to add interest from New York Civil Practice Law and Rules § 5001 (McKinney 1992), which generally allows courts to award pre-judgment interest on damages. After determining the pre-judgment interest rate in New York to be 9 percent per annum, the court picked a "reasonable intermediate date" of December 18, 1987, from which to compute the interest. Under this formula, the amount of interest between December 18, 1987, and January 28, 1991, totalled $4,513,697.

The appellants point out that the Limited Partnerships filed voluntary petitions for Chapter 11 reorganization on May 25, 1984. Thus, they argue, the bankruptcy court's calculation of interest from 1987 through 1991 constitutes an improper award of "post-petition" interest on the creditors' claims. The trustee concedes that the bankruptcy court's award of interest was calculated "post-petition."[10] Nonetheless, the trustee urges us to

_____

[10]The trustee also argues that the award of interest was proper under the "return of capital" theory of liability, which we declined to address in this opinion. *See supra* note 4. The trustee's argument misses the mark. Under New York Partnership Law § 106(4), a limited partner who withdraws his capital contribution to the partnership may be required to put it back *with interest,* but only if the return of the withdrawn capital

affirm the bankruptcy court's award of interest under an "abuse of discretion" standard of review. *See In re San Joaquin Estates, Inc.,* 64 B.R. 534, 536 (9th Cir. BAP 1986) ("A bankruptcy court's decision to award [post-petition] interest is a matter of discretion and is subject to reversal only for an abuse of discretion. The award of post-petition interest is dependent upon the equities of the case." (citations omitted)).

We decline the trustee's invitation to affirm the bankruptcy court's award of post-petition interest under the circumstances of this case. The bankruptcy court was apparently unaware that its award of "pre-judgment" interest at the New York rate actually constituted "post-petition" interest. The bankruptcy court even stated that its opinion was written "without prejudice to the rights of creditors to apply to this court for post-petition interest." Under these circumstances, we cannot determine whether the bankruptcy court abused its discretion by awarding "post-petition" interest.

Accordingly, we VACATE that portion of the lower courts' opinions awarding the trustee $4,513,697.00 in interest and REMAND for further proceedings not inconsistent with this opinion.[11]

_____

(plus interest) is necessary to discharge the partnership's liabilities to its creditors. Under § 106(4), therefore, interest is added to the withdrawn capital contributions, not to the creditors' claims. The bankruptcy court's conclusion of law with respect to the interest issue under § 106(4) has nothing to do with its separate conclusion of law with respect to general pre-judgment interest. *See In re Securities Group 1980,* 124 B.R. at 894 (discussing interest under § 106(4) and pre-judgment interest as separate conclusions of law).

[11]On remand, we instruct the bankruptcy court to take into account that no interest may be calculated based upon the now-disallowed FDIC claim.

E. *Proceeds of Settlements*

Although the bankruptcy court did not make findings of fact concerning the amount of settlements it may have received from parties alleged by the trustee to be jointly and severally liable with the appellants, the appellants state that the court received at least $4,845,650.08 in such settlements. According to the appellants, the bankruptcy court applied only $2,140,751.38 from these alleged settlements to reduce the appellants' liability; apparently, the court applied the remaining $2,704,898.70 to cover certain administrative expenses of the Limited Partnerships' bankruptcies. *See In re The Securities Group 1980,* 124 B.R. at 889 & n. 26. The appellants contend that the bankruptcy court's treatment violates New York General Obligations Law § 15-103 (McKinney 1989) (stating that any consideration received by a creditor in settlement of a debt discharges, to the extent of the amount received, the liability of all other persons jointly liable to the creditor for the loss). The appellants' argument is vague. After considerable effort to decipher the appellants' meaning, we believe they are attempting to make the following argument: that the extent of the total liability (for additional contributions) of all former limited partners is the amount of the obligations to creditors as of the Withdrawal Date, and that any amounts collected by the trustee from other former limited partners would reduce the total amount for which the appellants are liable. The appellants apparently deduce from the foregoing that they should be responsible for no administrative expenses. Not only do the appellants fail to articulate the foregoing proposition clearly,

they cite no authority for the proposition, and we do not find it intuitively obvious. Neither the bankruptcy court nor the district court addressed such an argument.[12] To the extent that the foregoing is the argument which the appellants intend to assert, we conclude that their lack of clarity and lack of support in their initial brief is sufficient to warrant our refusal to entertain the argument. We deem the argument abandoned. *See Beckwith v. City of Daytona Beach Shores, Fla.,* 58 F.3d 1554, 1561 n. 11 (11th Cir.1995) ("Generally, issues not clearly raised in the briefs are considered abandoned.").[13]

F. *Subordination of the Appellants' Counterclaims*

In the bankruptcy court, the appellants filed counterclaims against the Limited Partnerships based upon violations of federal securities laws and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"). Essentially, the appellants alleged that their purchase of limited partnership interests was tainted by criminally fraudulent activity by the general partners. The appellants sought to apply the recovery on their counterclaims as a "set off" against their liability to contribute additional capital to the Limited Partnerships. *See* 11 U.S.C. § 553 (under certain circumstances, allowing a creditor "to offset a mutual debt owing by such creditor

---

[12]The appellants' brief to the district court on this matter is almost identical to their brief to this court. It is not surprising to us that the district court failed to address this argument.

[13]The appellants also state in their brief that the trustee has received additional settlements subsequent to the bankruptcy court's entry of final judgment. We leave the disposition of the proceeds of these settlements to the bankruptcy court on remand.

to the debtor").  The bankruptcy court rejected the appellants' counterclaims on the merits.  *See In re The Securities Group 1980,* 124 B.R. at 901.  In the alternative, the court held that the appellants were not entitled to set off their purported damages against their liability to the creditors of the Limited Partnerships.  In denying the appellants' alleged right to a set off, the court drew analogies to mandatory subordination under 11 U.S.C. § 510(b) (providing that certain claims arising from the purchase of a "security" of the debtor "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security") and equitable subordination under 11 U.S.C. § 510(c)(1) (authorizing the bankruptcy court "under principles of equitable subordination [to] subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim").  *See id.* at 903-07.

The appellants concede that the right to a set off under § 553 is merely permissive and subject to the discretion of the bankruptcy court.  *In re Diplomat Electric, Inc.,* 499 F.2d 342, 346 (5th Cir.1974) (holding that the right to a set off in bankruptcy is discretionary and reviewing the denial of a set off for "clear abuse").[14]  In this case, had the bankruptcy court allowed the appellants' set off claims, the assets available to satisfy the Limited Partnerships' creditors would have been reduced dollar for dollar by the amount of the damages set off.  In light of this

---

[14]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

situation, the bankruptcy court determined that the equities favored the Limited Partnerships' creditors, who relied on the limited partners' public promise to contribute additional capital. Under all the circumstances, including the strong policy underlying the partnership law of New York to protect creditors as compared to the capital contribution of partners,[15] we cannot say that the bankruptcy court abused its discretion in denying the appellants' set off claims under these circumstances.[16]

## V. CONCLUSION

We AFFIRM the order of the district court insofar as it affirms the bankruptcy court's judgment that the appellants are liable pursuant to New York Partnership Law § 106(1)(b). We AFFIRM the order of the district court insofar as it affirms the bankruptcy court's judgment that the appellants' liability includes the lease claims asserted by The Equitable and by 767 Third Avenue. We VACATE the order of the district court insofar as it affirms the bankruptcy court's judgment that the appellants' liability includes the FDIC's claim and REMAND with instructions to modify the judgment accordingly. We VACATE the order of the district court insofar as it affirms the bankruptcy court's judgment that the appellants' liability includes $4,513,697 in interest and REMAND with instructions to modify the judgment in a manner not

---

[15]*See* discussion of *Whitley v. Klauber,* 51 N.Y.2d 555, 435 N.Y.S.2d 568, 416 N.E.2d 569 (1980) and *Kittredge v. Langley,* 252 N.Y. 405, 169 N.E. 626 (1930) in Part IV.B., *supra.*

[16]In light of this disposition, we need not address any of the appellants' other arguments, including, *inter alia,* the merits of the appellants' securities fraud and RICO counterclaims.

inconsistent with this opinion.  Finally, we AFFIRM the order of the district court insofar as it affirms the bankruptcy court's judgment denying the appellants' claim for a set off.

AFFIRMED in part, VACATED and REMANDED in part.[17]

---

[17]Appellees' motion to dismiss this appeal as to Kirschner Brothers and Ernest E. Norris is DENIED.